[No. 8496.]

## BULGER V. THE PEOPLE.

1.  CRIMINAL LAW—*Instructions—Insanity—Delusions.*

Indictment for Wilful Murder, defense insanity.

The court instructed jury that all insane delusions ''may be considered in connection with other evidence tending to show insanity.'' It was contended that as the delusions of the prisoner detailed in the evidence were in no way connected with the homicidal act, or related to the deceased, the instruction was improper, as in effect advising the jury that unless the prisoner's delusions were connected with, and caused the fatal shot, he must be guilty. But the several phases of the defense being clearly submitted to the jury by other points of the charge, and the jury expressly told that if, from all the evidence, they had a reasonable doubt as to whether, at the time of firing the fatal shot, the prisoner was capable of forming in his mind the intent to commit murder, they must acquit, the contention was overruled. (168, 169.)

2.  TRIAL—*Voluntary Remarks of Witness Prejudicial to the Accused.* To have advantage of such impropriety counsel must object at the time, move to strike it out, or, at some time during the trial, pray an instruction to the jury to disregard it. (170.)

3.  ERROR—*What May Be Assigned for Error.* Sustaining an objection to a question which is afterwards withdrawn, so that the witness is permitted to answer it is not assignable as error. (170, 171.)

4.  EVIDENCE—*Insanity.* Prior to the homicide the prisoner had a fight with one Clark. Conversation between Clark and a partner of the murdered man, as to this fight, which had not come to the knowledge of the prisoner before the homicide, was held immaterial. (171, 172.)

Where in a criminal prosecution insanity is the defense, the acts, conversations, and exclamations of the accused may be shown, as *indicia* of his mental condition. (172, 173.)

5.  —— *Immaterial Matter.* One who inquires as to immaterial matter must accept the answer given. He is not permitted to contradict it. (172.)

6.  EXPERTS—*Examination of.* Whether, upon the question of insanity, an expert witness is permitted to detail the facts of particular cases of which he speaks, not decided. But *held* that in view of all the evidence in the record, statements made by experts relative to particular cases which had come within their observation were clearly without effect upon the conclusions of the jury as to the prisoner's mental condition. (175, 176.)

*Error to Denver District Court.* Hon. JOHN A. PERRY, Judge.

Mr. GEORGE L. NYE, Mr. A. T. MONSON, Mr. PAUL W. LEE, Mr. M. H. AYLESWORTH, for plaintiff in error.

Hon. FRED FARRAR, attorney general, Mr. CLARENCE M. HAWKINS, Mr. RALPH E. C. KERWIN, assistant attorneys general, for The People.

WHITE, J., delivered the opinion of the court.

James C. Bulger, the plaintiff in error, shot and killed Lloyd F. Nicodemus in the latter's hotel in the City and County of Denver on the 7th day of May, 1914, and was thereafter, in relation to the matter, charged with murder in the first degree, tried and convicted thereof, and, in accordance with the verdict of the jury, sentenced to death, and brings the cause here for review. The alleged insanity of the defendant was the sole defense interposed.

In order to dispose of the assignments of error it is necessary to briefly state the facts. J. C. Starkweather and the deceased were joint managers of the Savoy hotel, and defendant Bulger and one Hugh Clark were both guests thereof. Prior to the day of the homicide the latter were not acquainted. Shortly before two o'clock on that day they, in company with others in the bar of the hotel, engaged in conversation relative to the possibility of war between the United States and Mexico. Bulger believed there would be war, and was engaged in organizing a regiment for the purpose of participating therein. Some one present undertook to formally introduce Bulger and Clark, whereupon the latter publicly and rudely announced his disinclination to meet the former, and Bulger thereupon made the remark: "All right, I will see you in five minutes," and left the room. He entered a taxicab, riding over the city and to various places, with, apparently, no definite purpose in view, except that he took a few drinks, called upon his lawyer and received some money which the latter held for the former, and made two trips to a hardware store where he purchased a couple of revolvers and some cartridges. These, for a time,

he entrusted to the chauffeur. He returned to the hotel about 3:30, entered the bar where he had left Clark, and the latter being therein the two engaged in a quarrel, which resulted in a fight in which Bulger was severely beaten and bruised upon the face. As a result of the beating Bulger was greatly excited and enraged, left the bar bleeding profusely, entered the hotel lobby talking in a boisterous and excited manner. He was thereupon taken to his room by Starkweather, a police officer was called, and, after some conversation, Starkweather requested Bulger to pay his bill and leave the hotel. The bill was paid and thereafter Bulger was led from the hotel by the officer, again entered the taxicab, and was driven over the city in much the same way as hereinbefore stated. He requested, and received of the chauffeur the packages containing the revolvers and cartridges, and after some further riding in the same aimless manner, directed that he be taken to Lincoln and Eighteenth streets, about a block and a half from the hotel. At this point he left the taxicab and walked to the hotel, entering the lobby thereof holding a revolver in each hand. He repeatedly, and in a loud tone of voice, said he was looking for the man who "had beaten him up." Nicodemus, the deceased, was standing at the clerk's desk or counter, and the defendant approached him saying: "Show the man that hit me," to which Nicodemus replied: "Colonel, I was abed and asleep, I don't know who hit you." The defendant continued the demand in a very loud voice, whereupon Nicodemus walked towards the telephone, and requested the operator to call an officer. Thereupon defendant said: "He is going to telephone for them to get me but I will get him," and walked rapidly toward the private office into which Nicodemus had entered. Defendant entered the door and almost instantly fired two shots, inflicting upon Nicodemus the fatal wound.

There was evidence tending to show that defendant is of an adventurous spirit and roving disposition; that he

had been a soldier in the United States army serving in the Philippine Islands, a ranchman, a land speculator in Colorado, a soldier in Central America, and an officer in Madero's army in Mexico; that his grandfathers had been addicted to the use of intoxicants; that his uncle was a heavy drinker, and that his father frequently had delirium tremens; that his mother, who at the time of the trial was approximately sixty years of age, was of a moody and melancholy disposition; that the age of defendant is thirty-three years, and for several years prior to 1912, he was of a cheerful temperament, neat in his appearance and friendly in his disposition, and was somewhat addicted to the excessive use of intoxicating liquors; that he left Denver in the summer of 1912, and shortly thereafter was shot in the head where the bullet remained embedded; that he returned to Denver in April, 1914; that upon his return he appeared to be slovenly and careless of his personal appearance and dress, drank to excess, and was more nervous, excitable and easily aggravated than before; that at time he was subject to certain delusions, and, in the opinion of some witnesses, including experts, was insane at the time of the homicide. There was evidence upon the part of the prosecution, including testimony of experts, tending to establish the sanity of the defendant. We will advert to other evidence in the discussion of some of the assignments of error.

An instruction upon delusional insanity, given to the jury over the objection of defendant, constitutes one of the principal grounds relied upon for reversal. The objection thereto is that "it singles out one element of insanity, namely, the element of insane delusions, and instructs the jury upon that element as separate and distinct from general insanity which is the plea of the defendant in this case." Counsel concede that if the defendant relied upon delusional insanity for a defense, the instruction given was proper, but claim that as the delusions of defendant, detailed in evidence, were in no wise connected with the homicidal act, or

related to the party killed, it was improper and highly prejudicial. They assert that the segregation and emphasis of delusional insanity from other causes detailed in evidence, affecting defendant's mental capacity, required the jury to consider it as a separate and unconnected factor in the solution of the question of criminal responsibility instead of conjointly with other causes, and, in substantial effect, advised the jury "that unless defendant's delusions were connected with, and caused the firing of the shot, the defendant must be found guilty." We think the instruction invulnerable to the objection urged, and its effect quite different from that claimed. No particular delusion is designated in the instruction, but reference is made to delusions as elements of insanity and the jury is expressly told therein that "all insane delusions may be considered in connection with other evidence tending to show insanity for the purpose of determining the question of insanity." The several phases of defense covered by the evidence, we think, are clearly and distinctly submitted to the jury for consideration under particular and appropriate instructions. By Instructions Numbers Eleven, and Twelve partial, temporary and general insanity are defined, and the nature and extent of each, essential to exonerate a party affected therewith from criminal responsibility for his acts, are fully stated. Instructions Numbers Fourteen, Fifteen, Sixteen and Seventeen relate to mental incapacity or unsoundness arising from the use of intoxicating drinks, drugs or narcotics, and assert that insanity arising therefrom, in whole or in part, or however caused, when of the character and to the extent explained in Instruction Number Eleven, constitutes a full defense or excuse for acts committed by one while so afflicted. Moreover, such instructions told the jury that if from a consideration of all the evidence, they had a reasonable doubt as to whether the defendant at the time of the firing of the alleged fatal shot was incapable of forming in his mnid the intent to commit the crime of murder, they could not find him

guilty and must acquit him; while Instruction Number Eighteen advised that notwithstanding the jury might believe, from the evidence, beyond a reasonable doubt, that the defendant killed the deceased, they could not find him guilty if, from a consideration of all the evidence, they entertained a reasonable doubt as to whether he was sane at the time of the homicide.

Upon cross-examination of an expert witness for the prosecution, defendant's counsel propounded and demanded an answer to a hypothetical question said to embody the facts of the case as claimed by defendant, whereupon the witness stated, in substance, that he could not assume the truth of such facts and did not believe them to be true. It is claimed that the court erred in failing to instruct the jury to disregard such statement of the witness, though he thereafter assumed the truth of the facts embodied in the question, and answered the same fully and in accordance with the theory of defendant. Moreover, it is conceded that no objection was made to the voluntary and non-responsive statement of the witness to the question propounded, nor did the defendant's counsel move to strike the same or request the court to instruct the jury to disregard it. It is common knowledge with the profession that in almost every trial witnesses volunteer remarks uncalled for by the questions propounded and in no sense responsive thereto. When this occurs, if a party deems himself prejudiced thereby he must interpose an objection thereto, move to strike it out, or at some time during the progress of the trial request the court to instruct the jury to disregard it.—*Goldberger v. People*, 45 Colo. 327, 101 Pac. 407.

Assignment of Error Number Nine embodies a question propounded, upon cross-examination, by counsel for defendant to an expert witness for the prosecution, and the action of the court in sustaining an objection thereto interposed by the district attorney. It is claimed that the question was proper and the defendant was entitled to have the answer

thereto given to the jury, and that counsel for defense, by the action of the court in the premises, was seriously handicapped and curtailed in his cross-examination of the witness. It is unnecessary to determine the relevancy and materiality of the question propounded and the right of defendant to have the same answered. The question and objection thereto are set forth in the record at folios fifteen hundred to fifteen hundred and four. The record discloses that thereupon a discussion followed, the jury was excused, and the defendant's attorney requested to present authorities in support of his contention, and court adjourned until the following morning. Upon reconvening it appears that the district attorney propounded to the same witness a few questions, and thereupon expressly withdrew his objection to the question forming the basis of the assignment, and it thereafter appears that substantially the same question was again propounded by defendant's counsel and answered by the witness.

Defendant attempted, but was not permitted, to show by a witness testifying for the defense, a conversation, in relation to defendant, had between Clark and Starkweather, about thirty minutes prior to the fight between Bulger and Clark. The court's action in that regard is relied upon for reversal.. Upon cross-examination the defendant had interrogated Starkweather relative to this conversation, and had propounded the question: "Didn't he (Clark) say to you, if Bulger comes back here I will run him ragged out of here," to which Starkweather replied: "I don't think so, he might have, but I don't remember, but think I would if such statement had been made." Counsel contend that defendant was entitled to have the witness detail the conversation for the purpose of impeaching Starkweather, and to show that Bulger was not the aggressor in the fight with Clark, and to disprove the alleged contention of the prosecution that defendant was of a quarrelsome disposition. It is not claimed that defendant knew of this conversation prior to the homi-

cide, or that deceased had knowledge thereof. It would, therefore, seem wholly immaterial and irrelevant to any issue in the case. We are unable to conceive how anything Clark or Starkweather said would disprove the contention, if there were such, of the prosecution that defendant was of a quarrelsome disposition. Moreover, who the aggressor was in that fight is of no consequence here, and the fact, if it be true, that Clark was of an aggressive or quarrelsome disposition in no sense affects or modifies similar characteristics in Bulger, if they exist. It is elementary that if a party inquires of a witness as to immaterial matters he must accept the answer, and is not permitted to raise an issue thereon by introducing evidence to contradict it. However, the court offered to permit counsel, if he desired, to ask of the witness the identical question he had propounded to Starkweather as to the threat made by Clark to run Bulger out of the hotel. Clearly, under these circumstances, the court's refusal to permit the witness to give in detail the conversation in question did not injuriously affect defendant's rights.

The prosecution, in rebuttal, was permitted to submit evidence of the remarks of Bulger to a stranger to whom the former had tried to introduce himself about a week prior to the homicide, and it is said that inasmuch as these remarks had a tendency to prove that Bulger was of a quarrelsome disposition and, inferentially, a bad man, and the defendant had not testified in his own behalf, it constituted error. When the issue of insanity is presented "the rule prevails that as *indicia* of the mental condition, not only the acts, but the conversations, exclamations and declarations of the person may be shown." *State v. Hays*, 22 La. An. Rep. 39, 40. The question is discussed in Wigmore on Evidence, § 228, as follows:

"Sanity and insanity are terms applicable to the mode of operation of the mind as judged by some accepted standard of normality. The mode of operation of the mind is as-

certainable from the conduct of the person in question, i. e., from the effect produced by his surroundings on his mind when responding by action to those surroundings. Virtually, then, the mind is one, while the surroundings are multifold; and the mode of operation cannot be ascertained to be normal or abnormal except by watching the effects through a multifold series of causes. On the one hand, no single act can be of itself decisive; while, on the other hand, any act whatever may be significant to some extent. The first and fundamental rule, then, will be that *any and all conduct* of the person is admissible in evidence. There is no restriction as to the kind of conduct. There can be none; for if a specific act does not indicate insanity it may indicate sanity. It will certainly throw light one way or the other upon the issue. 'Upon this I believe that no difference of opinion will be found to exist,' said Mr. Justice Patteson, in a celebrated case, 'as to the principle on which such evidence is admissible.' There can be no escape from this consequence. There is no distinction in kind (whatever there may be in degree) between one or another piece of conduct as evidence to be considered; *some* inference is always possible: * * *."

The evidence of the embedded bullet in defendant's head consisted in statements to that effect made by the defendant to experts examining him subsequent to the homicide, a scar on the outside of the skull, inability to freely use the left arm, and testimony of his sister that she had received a telegram from the superintendent of a hospital advising her of the injury in that regard, together with certain X-Ray shadowgraph exhibits of defendant's head disclosing either in the brain substance or embedded in the bone in close proximity thereto, a bullet and some fragments thereof or some other foreign substance. Defendant's experts testified that the chief causes of insanity which they found in defendant were an hereditary tendency to alcoholism, and possible mental weakness, trauma to the head, sunstroke, fever, pernicious malaria, residence in the

tropics, and his occupation; that the effect that trauma has upon an alcoholic is usually to make him an inebriate or the subject of alcoholic insanity, at once, and, in their opinion, such was the form of insanity with which defendant was afflicted. No claim was made by defendant that the trauma alone caused his alleged insanity, or that any one so wounded would necessarily become insane. Two expert witnesses, on behalf of the prosecution, were asked to give their opinion as to the effect a bullet or lead lodged in the head, as shown by the shadowgraphs in evidence, would have on the subject, and replied that it was uncertain; that it might destroy one's mental capacity; that it would be more likely to affect the leg than the arm, though it might affect the latter; that the leg could hardly escape, however, if the arm were affected; that if there was a bullet underneath the skull, or in the skull and a portion thereof on the brain, the effect upon the defendant could not be answered definitely; that any answer given must be qualified; that if the bullet was sterile it might remain without causing any mischief; that if the bullet was in the region of the ventricle it might be lodged between the fibres and cause very little trouble, and that experience had shown that lesions on the right side of the brain are not associated with any marked mental change, and oftentimes without any perceptible mental change; that the injury to defendant's head or brain, coupled with previous alcoholic insanity, if such existed, and the subsequent beating he received, might have had the effect to render him insane. The aforesaid experts for the prosecution were each permitted, over the objection of the defendant, to state a case of injury to the head that had come under his observation. One expert stated that he had examined a case of tumor of the brain, in the particular lobe in which the foreign substance appeared in defendant's brain; that the portion of the skull overlying the tumor was removed to allow the tumor to bulge outward; that the tumor grew and encroached upon the motor tracts, resulting in rigidity,

spasms, and convulsions of the arm, followed by inflammation of the leg and the face, and there was but little perceptible mental change until the onset of coma, only a few days before the patient's death; that it is difficult to differentiate the effect of foreign substances in, or rupture of, the brain. The other expert stated a case coming under his observation, where a bullet had entered the brain and embedded itself therein, in approximately the same location as that of the foreign substance in defendant's brain; that the patient had slight convulsions for two or three days on one side of his body, and was in a dazed condition, could not talk for a short time, but in the course of approximately three weeks made a complete recovery, and was thereafter in good mental health.

In answer to a hypothetical question embodying and assuming the truth of the facts as claimed by the defense, both experts answered that they would have doubt as to the defendant's sanity at the time of the homicide, while from their own examination of defendant, which was detailed in evidence, and likewise upon the assumption of the truth of the state's testimony, they were satisfied that he was sane at the time of the homicide.

Defendant claims that while an expert on direct examination may be permitted to give the source of his special knowledge, experience or skill, he should be confined to general statements and not be permitted to give the facts of a special case, and that the admission of the evidence in question was highly prejudicial to his rights in the premises. Counsel cite and rely upon the following authorities, to-wit: Elliott on Evidence, § 1123; *Clark v. Willett,* 35 Calif. 534; *Bollman v. Lucas,* 22 Neb. 796, 36 N. W. 465; *Hunt v. City of Boston,* 152 Mass. 168, 25 N. E. 82; Rogers on Expert Testimony, § 30; Jones on Evidence, § 377.

On the other hand counsel for the people contend that the evidence in question was competent and in no wise prejudicial to defendant. They claim that there is a distinction

between the rule announced in the authorities relied upon by defendant and the rule applicable to the facts of this case, and in support of their contention cite and rely upon the following authorities: *Van Wyk v. People,* 45 Colo. 1, 99 Pac. 1009; *Frank v. State,* 141 Ga. 243, 80 S. E. 1016, 1044; *State v. Mortensen,* 26 Utah 312, 73 Pac. 562, 633; *State v. Ryno,* 68 Kan. 348, 74 Pac. 1114, 64 L. R. A. 303; *McKay v. Lasher,* 121 N. Y. 477, 24 N. E. 711; *Lewiston S. M. Co. v. Androscoggin Co.,* 78 Me. 274, 4 Atl. 555; *Keith et al. v. Lothrop,* 10 Cush. 453, 457; *Lincoln v. Taunton Copper Co.,* 91 Mass. (9 Allen) 181, 191; *Sexton v. No. Bridgewater,* 116 Mass. 200, 207; *Demerritt v. Randall et al.,* 116 Mass. 331; *People v. Shattuck,* 109 Cal. 673, 42 Pac. 315; *Streight v. State,* 62 Tex. Cr. R. 453, 138 S. W. 742; Chamberlayne's Modern Law of Evidence, § 2533; Encyc. of Evidence, vol. 5, p. 495.

Whatever be the true rule in the premises, or whether the evidence was admissible upon any theory of the case, we deem unnecessary to determine. It affirmatively appears that defendant was in no wise injured by the testimony in question. Upon the particular issue to which it related, there was no controversy. Neither the defendant nor the prosecution claimed that an injury to the brain of the character and extent of that from which defendant was suffering, necessarily, and of itself, caused insanity; but they mutually agreed that it might, and, coupled with other causes detailed in evidence, probably would, produce that effect. In fact, the issue as between the experts resolved itself into a question of the truth of the evidence as to the hereditary, unstable, and neurotic character of defendant. If the evidence established the claims of defendant in that regard, the injury to the brain, and the beating which the defendant received a short time before the homicide, might, and probably did, produce in him insanity. If the evidence failed in that respect and the defendant, as contended by the people, was of normal type, the trauma of the brain,

coupled with the beating, would not, in reasonable probability, though it might, produce that result. Clearly, under such condition of the evidence, the general statements relative to the two specific cases coming under the observation of the state's experts had no effect whatever upon the jury in determining the real issue of the case—the sanity or insanity of the defendant. The statements certainly did not fortify the opinions of the state's experts, for they conceded that if the defendant's heredity, history, experience and physical condition actually existed as testified to by his experts, they would pronounce him insane.

We have very carefully considered the entire evidence, and every assignment of error argued, and are convinced that defendant had a lawful and impartial trial, and that the evidence was amply sufficient to warrant the verdict. The judgment of the District Court is, therefore, affirmed, and it is further ordered that it be executed during the week commencing the 31st day of October, 1915.

*Judgment affirmed.*

Decision *en banc.*

HILL, J., SCOTT, J., and TELLER, J., dissent.

Decided July 12, A. D. 1915. Rehearing denied October 4, A. D. 1915.