[Nos. 8496 and 8879.]

## BULGER V. THE PEOPLE.

1. CRIMINAL LAW—*Insanity After Conviction—Inquisition.* Under Rev. Stat., sec. 1614, when the insanity of a convicted person is suggested, the court may determine the condition of the prisoner's mind by personal examination either public or private, by inquiry of the physicians who have attended him, or those having him in custody, and after such inquiry, the judge should order an inquest, only when he believes him insane, or doubts his sanity. (193.)

2. —— *Error to the Inquest*, does not lie. (195.)

3. —— *Nor Certiorari*, unless it appears that the court in which the inquest was held was without jurisdiction. (195.)

No. 8496. *Error to Denver District Court.* Hon. W. D. WRIGHT, Judge.

No. 8879. *Original Proceeding in Certiorari.*

Mr. GEORGE L. NYE, Mr. A. T. MONSON, Mr. PAUL W. LEE, Mr. M. H. AYLESWORTH, Mr. JOHN W. GILLESPIE, for plaintiff in error.

Hon. FRED FARRAR, Attorney General, Mr. NORTON MONTGOMERY, Mr. CLARENCE M. HAWKINS, Mr. RALPH E. C. KERWIN, Assistant Attorneys General, for The People.

WHITE, J., delivered the opinion of the court.

The plaintiff in error, who will hereinafter be called the defendant, was convicted in the District Court within and for the City and County of Denver, of the crime of murder in the first degree, and, upon the verdict of the jury, sentenced to be hanged as the law provides. Thereafter, upon proceedings in error in this court, the judgment of the trial court was affirmed, and an order entered that the judgment be executed during the week commencing the 31st day of October, 1915. See Case No. 8496, in this court, entitled *Bulger v. The People,* 60 Colo. 165, 151 Pac. 937. Within such week and on the afternoon of the day before the expiration of the time so fixed, the defendant, by his attorneys, filed an application in the case in this court for "a stay of execution" in order that an inquiry, as provided by our Criminal Code, §1614 R. S., 1908, might be had as to defendant's sanity. The application was verified and certain affidavits were presented therewith. It was alleged in the application that "since the trial, conviction and sentence" of defendant "he has become disordered in mind and insane, and now is disordered in mind and insane, and, for that

reason, the sentence of death should not and cannot, under the law, be imposed upon him." One of the affidavits accompanying the petition was that of a reputable physician, practicing in the City and County of Denver, and who had made a special study of mental and nervous diseases. It appeared therefrom that the affiant had examined the defendant since he was sentenced, and found that he "was at the time of affiant's examination, and now is, an insane person." It further appeared from the application, affidavits in support thereof, and the statement of counsel that on the preceding day, that is, November 4, 1915, application had been made to the trial court or the judge presiding therein, in which it was alleged that since judgment was pronounced in said cause the defendant had become insane, which was accompanied by the hereinbefore mentioned affidavit of the physician, and a request made that the sanity of defendant be inquired into; that the Honorable W. D. Wright, then presiding in the Division of the trial court wherein defendant was tried and sentence pronounced, was of the opinion that as the trial was had and the sentence imposed upon defendant at a former term, and the case brought to this court on error, and the judgment thereafter affirmed, the trial court had no jurisdiction in the premises, and, for that reason alone, denied the application, stating that if he thought the trial court had jurisdiction, and there was sufficient time for the hearing before the date fixed for execution, he would order the inquisition. Thereupon we entered an order vacating the date we had designated for carrying into effect the judgment of the District Court, and fixed a subsequent date for that purpose, and ordered that defendant, with all convenient speed, apply to the District Court wherein his trial was had and sentence pronounced, to have the question of his sanity determined at the time of impaneling a jury for that purpose in the manner the law provides, and that, on completion of the proceedings, the

result thereof, be certified to the court, "upon which, such further order and judgment, if any, shall be entered as the law requires." Thereafter it was made to appear to this court that the inquisition would not be concluded before the expiration of the date fixed for defendant's execution, and we thereupon, by an order duly entered, fixed a later date therefor, to-wit, during the week beginning February 27, 1916. January 11th the result of the inquisition was certified by the Clerk of the District Court and filed in the cause in this court. The report shows that the jury found the defendant "to be now sane."

Defendant, thru his counsel, has filed and tendered for filing in *Bulger v. People, supra*, certain motions, petitions and portions of the alleged record of the proceedings in the inquiry as to his sanity. He has also instituted an original proceeding in this court, No. 8879, the object of which is to have us review the inquisition by means of the writ of *certiorari*. In the former case we were asked to change the date fixed for the execution of the judgment, and fix a later date therefor, which we did, designating for that purpose the week beginning May 21, 1916. The papers presented and filed therein also request that we direct the District Court to certify to this court a complete transcript of the inquisition as to the present sanity of defendant, and that thereupon we review such proceedings, reverse the finding of the jury therein and cause a new inquisition to be held before another jury impaneled for that purpose. It is clear that the matters presented by the application and papers in case No. 4896 and in the petition for *certiorari* relate to the same alleged right of defendant, that is, to have this court review the inquisition proceedings as to his sanity, annul the verdict of the jury therein, and cause a new inquisition to be held. The matters were argued at the same time and will, therefore, be determined in one opinion.

Defendant does not appear to have any well defined

theory of procedure under which his alleged right may be protected, but the most liberal view we may take of his contention in that regard is that we are empowered to review the proceedings here involved: (1) Upon writ of error; (2) On writ of *certiorari;* (3) By virtue of the order which we entered in case No. 8496 changing the date therein fixed for the carrying into execution the judgment of conviction and designating a subsequent date for that purpose, and ordering the defendant to apply to the District Court to have the question of his sanity determined and the result thereof certified to this court.

1. If this court were invested with power to review such proceedings upon writ of error, it is doubtful if the record here presented would authorize it to act in the premises, but, apart from this, we are satisfied that the writ of error affords no remedy. The inquisition was authorized by the provisions of §1614, R. S. 1908. This statute constituted §12 of "An Act Concerning Criminal Jurisprudence" passed by the Territorial Legislature in 1861, and has ever remained a part of the criminal code of this state. It is in the following language: "A person that becomes lunatic or insane after the commission of a crime or misdemeanor ought not to be tried for the offense during the continuance of the lunacy or insanity. If, after verdict of guilty and before judgment pronounced, such person becomes lunatic or insane, then no judgment shall be given while such lunacy or insanity shall continue; and if after judgment and before execution of the sentence, such person becomes lunatic or insane, then in case the punishment be capital, the execution thereof shall be stayed until the recovery of such person from the insanity or lunacy. In all these cases it shall be the duty of the court to impanel a jury to try the question whether the accused be at the time of the impaneling insane or lunatic." The rule of the common law in this

regard is stated in Hammond's Blackstone's Commentaries, Book 4, Chap. 2, pp. 24, 25; Cooley's Blackstone, (4th ed.), Vol. 2, pp. 1230, 1231, as follows: "In criminal cases, therefore, idiots and lunatics are not chargeable for their own acts, if committed when under these incapacities; no, not even for treason itself. Also if a man in his sound memory commits a capital offense, and before arraignment for it, he becomes mad, he ought not to be arraigned for it; because he is not able to plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried: for how can he make his defense? If, after he be tried and found guilty, he loses his senses before judgment, judgment shall not be pronounced; and if, after judgment, he becomes of non-sane memory, execution shall be stayed: for peradventure, says the humanity of the English law, had the prisoner been of sound memory he might have alleged something in stay of judgment or execution. * * * But if there be any doubt, whether the party be *compos* or not, this shall be tried by jury."

The right to a jury trial, however, even in cases of doubt, was not inherent at common law, though in such cases it was usual to impanel a jury and summarily try the collateral issue. Cooley's Blackstone, (4th ed.), Vol. 2, p. 1524 and notes. The law on this point is fully stated in I Hawkins P. C., p. 2, in the notes, where it is said: "Every person of the age of discretion is presumed of sane memory, until the contrary appears, which may be, either by the inspection of the court (1 Hale, 33; Tr. per Pais 14; O. B. 1783, No. 4); by evidence given to the jury, who are charged to try the indictment, ( 3 Bac. Abr. 81; 1 Hale, 33, 35, 36; O. B. 1784, No. 283,) or, being a collateral issue, the fact may be pleaded and replied to *ore tenue,* and a venire awarded, returnable *instanter* in the nature of an inquest of office. (Fost. 46; Kel. 13; 1 Lev. 61; 1 Sid. 72; 4 Comm.

Appen. sec. 3.)    And this method, in cases of importance, doubt or difficulty, the court will, in prudence and discretion, adopt. (1 Hale, 35.)" But, when the judge is satisfied that the defendant has become insane after trial, he may in his discretion, without submitting the question to a jury, reprieve him until he regains his senses. 4 Blackstone's Comm., p. 396; *Bonds v. Tennessee,* M. & Y., 143, 17 Am. Dec. 795; *Nobles v. Georgia,* 168 U. S. 398, 42 L. Ed. 515, 18 Sup. Ct. 87.

It will be observed that both the common law and the statute are specific that when a person becomes insane after conviction of a capital offense, he shall not be executed until his recovery from the lunacy, and under the statute when the fact of insanity exists a jury shall be impaneled to try the question. The statute, however, does not state in what manner the fact of insanity shall, in the first instance, be ascertained and the common law necessarily controls in that regard. Thereunder when insanity in such cases is suggested or alleged the court may determine the condition of the prisoner's mind by a personal inspection or examination of him, either public or private; by inquiry from attending physicians, or from those around the prisoner who have means of knowledge; and if, after such investigation and inquiry, the judge has no doubt of the prisoner's sanity he is neither bound to nor should he order an inquisition. 10 Cyc. Pl. & Prac., p. 1220; *Bonds v. Tennessee, supra; Nobles v. State, supra.*

It would, therefore, seem that the sole modification of the common law by the statute is to require the court in cases where it believes that defendant is insane, or, perhaps where it has doubt of his sanity, to impanel a jury and try the question. Buswell on Insanity, §461. At common law collateral proceedings of this character were, of course, not subject to review, and if reviewable at all the authority therefor must be found in our constitution or statutes. *State*

v. *Nordstrom*, 21 Wash. 403, 58 Pac. 248, 53 L. R. A. 584, 585; Buswell on Insanity, *supra*.

We are unable to find any provision of our law which expressly or impliedly gives the defendant the right to have such proceedings reviewed on error. The only purpose of the inquiry at this stage is to advise the court whether it should postpone the punishment until defendant recovers his senses. The defendant has heretofore exercised the right of review on error of the final judgment entered in the criminal case secured to him by the statute. §1944 R. S. 1908. His rights as an offender on trial for an offense are not involved in this collateral matter. *Nobles v. State, supra*. There is no final judgment therein, and clearly such proceedings can not be reviewed on error. A defendant is not permitted to prosecute successive writs of error to the same judgment, and the law has in no wise extended the right to review on error to matters arising incidental to the enforcement of a judgment after its affirmance by the reviewing tribunal. In *State v. Nordstrom, supra*, after stating that if such proceedings are reviewable at all the authority therefor must be found in the law of the state, it is said:

"We find no express statutory provision, and we do not think that any provision of the statute relating to appeals is applicable to a case like this. It is true that the statute provides for appeals from final orders after judgments affecting substantial rights. 2 Ballinger's Anno. Codes & Statutes, §6500. But it is manifest, we think, that the orders there contemplated are not, as are these, collateral to the main case or proceeding before the court; and elsewhere the decisions, so far as we are informed, have been adverse to the contention of the appellant. Mr. Buswell, in speaking of insanity in bar of sentence, says: 'So where, after verdict and judgment, the defendant by his counsel alleged as a reason why sentence should not be pro-

nounced that the defendant was a lunatic, it was held that if the court, on its own inspection, was satisfied that the allegation of insanity was false, it might properly proceed to pass sentence without impanelling a jury to try the question. But it was added that, if the court should entertain any doubt on the subject, or the question should appear difficult, a venire should issue, returnable instanter, to ascertain the fact. And the question whether an inquiry is called for by the circumstances of the case is for the determination of the court, who may also direct the manner in which such inquiry shall be conducted. Error will not lie to review the proceedings upon such an inquiry, whether the allegation of insanity be made before or after the conviction of the prisoner.' Buswell, Insanity, §461. See *Inskeep v. State,* 35 Ohio St. 482, 36 Ohio St. 145; also *Freeman v. People,* 4 Denio, 9, 47 Am. Dec. 216. -In *Darnell v. State,* 21 Tex. App. 6, 5 S. W. 522, the Court of Appeals of Texas held that the judgment of the trial court upon an inquiry, after conviction, as to the question of insanity, was conclusive, and that no appeal would lie therefrom. While this decision is based upon a statute of that state, it would seem that it is equally supported by common sense and sound reason."

The following are to the same effect: Cases in note to *Baughn v. State,* 100 Geo. 554, 28 S. E. 68, 38 L. R. A. 577, 589; *Crocker v. State,* 60 Wis. 553, 19 N. W. 434; 12 Cyc., p. 799.

2. By §3 of art. VI of the Constitution this court has power to issue writs of *certiorari* and other writs therein enumerated. Those writs, however, are the common law writs, and under our decisions when a writ of *certiorari* is issued by this court it is limited solely to the question of the jurisdiction of the inferior tribunal. *Leppel v. District Court,* 33 Colo. 24, 27, 78 Pac. 682; *People v. District Court,* Idem, 293, 80 Pac. 908; *People v. District Court,* 30 Colo. 488, 71 Pac. 388.

In the petition before us it is not shown that the trial court in the lunacy inquisition, was without jurisdiction. On the contrary, it affirmatively appears therefrom that it had jurisdiction of such inquiry by virtue of §1614 R. S. 1908. The facts alleged in the petition, if true, constitute mere errors in the exercise of such rightful jurisdiction. These errors are alleged to have occurred during the progress of the trial, and relate to the giving of instructions, the admission and rejection of testimony, the selection of the jury, and alleged misconduct of the District Attorney and of the court. Defendant's counsel concede that the writ of *certiorari* is not a proper remedy, unless it can be said that the decision of this court in *People ex rel. Hagerman v. Court of Appeals*, 32 Colo. 147, 75 Pac. 407, has so enlarged the scope of such common law writ as to make it applicable to the facts of this case. The decision to which reference is made, and others of like character, recognize the right of this court to review upon *certiorari* a judgment of the Court of Appeals in a cause wherein it had no jurisdiction, or when in a clear case that court has refused to be guided or controlled by the law as laid down in prior decisions of this court. No such question is involved in the case at bar and if those cases have created an exception to the general rule, it is not applicable to the facts of the instant case.

3. We are clearly of the opinion that we are not authorized to review the proceedings upon the trial of the question of the sanity of defendant, by virtue of the order we entered in case No. 8496, changing the date for carrying into effect the judgment of the lower court. Those proceedings were by virtue of the statute, and the common law, and not by virtue of the order of this court. Moreover, the proceedings were not in the nature of a reference in an equity case for the purpose of taking testimony and certifying the result to this court, as claimed by defendant. If

that meaning should be ascribed to the order, it would render it invalid in that respect, as this court, with the exception of the original jurisdiction invested in it by §3 of Art. VI of the Constitution, and the superintending control it possesses over inferior courts by § 2 of the same article, is invested with appellate jurisdiction only; and the power of review and control may be exercised only "under such regulations and limitations as may be prescribed by law." Courts are instruments of government and can exercise only such powers as are invested in them.   The relation of remedies to rights is fundamental and can not be disregarded.   Whosoever exercises power in a constitutional government must do so in substantial compliance with the rules prescribed or his action in the premises is unlawful. For a court to usurp power, notwithstanding it may be for the purpose of righting a supposed wrong is no less reprehensible than the exercise of physical force by a mob for a like supposed purpose. Constitutional government can not exist where either practice is the rule. *Board of Control of State Home v. Mulertz,* 60 Colo. 468, 154 Pac. 742, 744, 745. Perhaps the order which we entered should have gone no further than changing the date of execution.   It appeared, however, that the trial court, whose duty it was, if the defendant had become insane after judgment, to impanel a jury to try such question, was convinced that the preliminary showing made in that regard was sufficient, and that the inquisition ought to be made.  So we deemed it not improper, after having extended the date which we had fixed for the execution to direct defendant to proceed according to law, and that we be advised of the result to the end that we might, if it seemed proper, make further orders as to the date of execution.   Having entered the order fixing such date, we unquestionably had the power to change it.   Moreover, it seemed essential that defendant act with all convenient speed in doing that which prompted us to change

the date of his execution, and that we speedily know the result thereof, so that we could prevent an abuse of our own order. *Ex Parte State*, 140 Ala. 489, 124 Am. St. Rep. 79, 82, 83, 10 L. R. A. (N. S.) 1129. If the application to this court had failed to disclose that the trial court was convinced that the inquiry as to the present sanity of defendant ought to be made, we would have been confronted with an entirely different question, the proper solution of which is unnecessary to determine at the present time.. The situation of the matter is, therefore, no different than it would have been, had this court, at the time of affirming the judgment of conviction, fixed the date of the execution for the week beginning May 21, 1916, and the proceedings in the District Court, upon the collateral issue as to the present sanity of defendant, been had without any action by this court. We do not wish to be understood as either approving or disapproving the manner in which the inquiry was carried on in the trial court. The proceedings in that regard are not, within the meaning of the law, before us and we do not deem it proper to express an opinion thereon. We are very certain, however, that it was intended by the common law and the statute that a collateral hearing of this character should not be subject to review by an appellate tribunal. If the right of review exists the absurd results that might follow therefrom are obvious. For, applying the language of the court in *Nobles v. Georgia, supra,* as a finding that insanity did not exist at one time would not be adjudged as to its non-existence at another, it would be wholly at the will of the convict to suffer any punishment whatever, for the necessity of his doing so would depend solely upon his fecundity in making claim after claim of insanity, to be followed by trial upon trial, and review upon review.

The motion of the Attorney General to strike the application of defendant and papers filed in support thereof in

case No. 8496, and likewise his demurrer to the petition
for *certiorari*, Case No. 8879, are, therefore, sustained, the
order directing that the execution of the judgment of the
trial court be carried into effect during the week beginning
May 21, 1916, affirmed, and the petition for *certiorari*, dis-
missed.

Decision *En Banc.*

HILL, J., and SCOTT, J., dissent.

SCOTT, J., dissenting.

I agree that if the defendant has a right to a review
in this proceeding, the authority therefor must be found
in the  Constitution and statutes, of the state.   Under the
common law the proceeding was in the nature of a favor
to the person alleged to be insane, and rested wholly within
the discretion of the trial court.   Under the law of this
state the proceeding is an expressly declared right to one
condemned to be executed.   The written law of the state
has superseded the common law, and the latter, nor rules
of procedure under it, nor precedents based thereon, can
have application here.

Under the statute, where judgment has been rendered
in a capital case, and the question of sanity is properly
raised, it is the mandatory duty of the court to stay the ex-
ecution of such judgment until the condemned shall have
recovered from such insanity.   Impliedly, and as ordered
by this court in this case, where the date set for the exe-
cution does not give sufficient time to try the question of
sanity, the court must stay the execution, that sufficient
time may be given for such proceeding.

The statute makes it the imperative duty of the court
to impanel a jury to try the question of the sanity of the
condemned at that particular time.   The law has thus taken
from the court all discretion in these matters, and has con-

ferred upon the condemned a vested right, which no court has the power to deny. This is the right to a trial for his life, and as much so, as when he stood charged with the crime of which he was convicted.

The result of the issue before the jury is the alternate of life or death. If he is insane he may live. If he is sane he must die.

The majority opinion bases refusal to permit a review of the proceedings before the District Court, upon failure to find any provision of our law, which expressly or impliedly, gives the defendant the right to have the proceeding reviewed on error, or otherwise.

The statute expressly declares, that in case the condemned shall be found to be insane, execution shall be stayed until recovery from the insanity or lunacy. The statute at least makes no express provision as to how such recovery shall be determined.

It is to be understood that in case of the recovery from insanity of one sentenced to be executed, that because the statute fails to provide a procedure to determine the fact of such recovery, the sentence shall never be executed.

We must in such case, so determine if the logic of the majority opinion is sound. For in such an event the statute does no even so much as provide for a hearing before a jury, as it does in the matter of a stay of execution. Will the majority say that the purpose of the statute is to be so nullified? On the other hand, can it be said that one so condemned to die, and where the judgment is stayed because of the present insanity of the criminal, he shall afterward be declared to have recovered his sanity, and be executed, arbitrarily, and without some proceeding, or before some tribunal with authority to determine the question of his sanity? The same vital result of life or death, is likewise there involved. The statement of the question is sufficient proof of its unreasonableness. Construed in the light of

reason, we must find the plainly implied purpose of the legislature to try the question of sanity, in the court of conviction, and before a jury, in both instances, i. e., where the judgment is to be stayed because of insanity, and where the condemned is to be executed because of recovery from insanity. Any different conclusion is to nullify the statute in its entirety; to make mockery of the legislative will, the plain purpose of which, was to prevent the execution of the insane, and to secure the enforcement of the mandate of the law when reason is restored.

The statute clearly provides that the trial shall be by the court, and before a jury, which the court shall empanel. What more in detail is provided in case of the trial of the defendant, for the murder of which he was convicted? It must be assumed that the legislature intended that usual and orderly procedure, usual and common to determine the question of sanity, specifying only such a court and such a jury as would be competent to exact the penalty of life in any case, thus fixing a different tribunal from that provided for insanity trials where crime is not involved.

Under the statute, the forfeit of a human life in payment of the law's penalty, is as much involved as in the trial for the crime.

The constitutional guaranty of due process of law cannot be abridged, simply because the life involved is that of one bereft of reason. Every instinct of humanity revolts at such a proposition. It was plainly the very purpose of the statute to repeal the barbarous procedure of the common law, that made human life dependent upon the caprice, judgment, or favor of a judge.

It is unreasonable then to say that error will not lie in such a case, and to review such a proceeding in the District Court, upon the sole reason that the particular statute does not specifically so state. This is repugnant to every provision of our law of procedure, where life or liberty is

involved and finds no consonance in the spirit of our laws. The statute under consideration provides an ancillary proceeding in the main case, just as vital to the defendant as the original proceeding, for it equally involves life. It of necessity embraces every reasonable and usual safeguard vouchsafed by the law, to those charged with crime, within which must be included the right to a review by this court.

We distinctly recognized this principle in this case when on the 15th day of October, 1915, we entered the following order:

"Error to the District Court of the City and County of Denver.

Be it remembered, that on this 5th day of November, A. D. 1915, it was made to appear to the court, by application duly verified, that on November 4th, 1915, there was presented to the District Court of the City and County of Denver on behalf of plaintiff in error an application in which it was alleged that since judgment was pronounced in said cause said plaintiff in error has become insane, with a request that his sanity be inquired into, which was denied; and it also appearing that previous to such application the Governor was requested to grant to plaintiff in error a reprieve so that the question of his sanity at the present time might be investigated, which was refused; and it also being made to appear to the court that the question of the sanity of the plaintiff in error at this time ought to be determined; and it further appearing to the court that by its judgment heretofore pronounced affirming the judgment of the District Court of the City and County of Denver, it was ordered that plaintiff in error be executed during the week ending November 6th, 1915.

Now, therefore, by virtue of the premises, the judgment of this court directing that plaintiff in error be executed during the week beginning October 31st, 1915, be and the same is hereby vacated in this respect, and in lieu thereof

it is ordered that said judgment of the District Court be executed during the week beginning January 2nd, 1916, but that in all other respects said judgment stand. It is further ordered that defendant with all convenient speed apply to the Criminal Division of the District Court to have the question of his sanity determined at the time of empaneling a jury for that purpose in the manner the law provides, and that on completion of said proceedings the result thereof be certified to this court upon which such further order and judgment, if any, shall be entered as the law requires."

We asserted jurisdiction of the whole case at that time, as being within our lawful power and duty, and we ordered the ancillary proceeding, commanded by the letter, spirit and purpose of the law. We did this, not in an independent or different proceeding, but in the original case of *Bulger v. People,* and we entitled it, "Error to the District Court of the City and County of Denver." Plainly, we also held that proceeding in hand, and retained jurisdiction and control over the whole matter, for we said, "and that on completion of said proceedings the result thereof be certified to this court upon which such further order and judgment, if any, shall be entered as the law requires."

We there directed the impaneling of a jury and a trial of the sanity of defendant. When we directed a trial of defendant's sanity, we directed a fair trial. When we directed a trial, we directed a trial of the defendant's sanity and nothing other. We did not direct a trial for the crime with which the defendant had been charged, for he had been so tried and convicted. That conviction had been affirmed by this court, and we were, at the time of the entry of the order, without right or power to disturb the finding of the jury in the criminal case. We stayed the execution of the judgment, and directed the sanity inquisition. The latter under our constitutional superintending power over all inferior courts. If we had jurisdiction then, we have juris-

diction now, and it is idle to discuss the right of review, writs of *certiorari* or other original procedure in this court.

But if we concede that the statute does not specifically provide that a review may be had in such a case, or a form of procedure therefor, it certainly does not deny such right of review. The fact that the statute repealed the procedure of common law upon that subject, which denied a right of review, is sufficient direction to this court to proceed under the statute alone.

Section 2, art. 6, of our Constitution provides that the Supreme Court "shall have a general superintending control over all inferior courts, under such regulations and limitations as may be prescribed by law." Acting within, and in harmony with this organic provision, the legislature of the state has enacted the following statute:

"The Supreme Court shall prescribe rules of practice and procedure in all courts of record, and may change or rescind the same. Such rules shall supersede any statute in conflict therewith. Inferior courts of record may adopt rules not in conflict with such rules or statute." Chap. 121 Laws 1913.

If then, there is no rule of procedure which grants a review in this case, then why not provide one now and here, when every instinct of humanity cries out for it; when every conception of righteousness pleads for it; and when every sense of justice demands it.

Acting under this statute this court has amended, repealed and enacted rules of procedure of every conceivable nature. We have superseded statutes in that regard. Then why shall the court now hesitate. Certainly the court's power to make such rule of procedure cannot be questioned. It may be said that a rule of procedure should not be made in a pending case. Have appellate courts ever hesitated to announce a principle and to adopt a rule for its enforcement in pending cases?

It is true that in matters involving common or ordinary matters of procedure, it is natural and just that rules of procedure should be provided in advance, and with due notice. But the statute we are considering was enacted by our first territorial legislature. It has ever since remained the law without modification or amendment.

In all this fifty-five years, so far as we are able to ascertain, the statute has not been presented for the consideration of the Supreme Court. We have no record that its humane and beneficient provisions have ever before been denied by a trial court. The case then, before us, is exceptional, and without precedent in the history of the judicial procedure of this state. What inconvenience or harm can be anticipated to come to the bench or bar, in the immediate announcement of such a rule. We are taught from our earliest study of the law, the inviolate maxim, that "where there is a right, there is a remedy." The law has conferred the specific and absolute right upon the defendant to a fair trial for his sanity. Will this court now deny the remedy to enforce that right.

We accord the right to a review in all civil cases, and in the slightest derelictions of the criminal law. Will reason, conscience, or justice, sanction the denial of review in a case where a person about to be executed, is alleged to be insane, and has been unfairly tried for his sanity, and thus take the chance of stamping an indelible stain upon the jurisprudence of our commonwealth.

The majority opinion, as a reason why review should be denied, quotes with approval an amazing statement contained in the opinion in the case of *Nobles v. Georgia,* cited, and as follows:

"It would be wholly at the will of the convict to suffer any punishment whatever, for the necessity of his doing so would depend solely upon his fecundity in making claim after claim of insanity, to be followed by trial upon trial, and review upon review."

This supposed situation is as preposterous as it is impossible. But, if there should be a possibility that the vagaries of this pipe dream might in any case become a reality, shall we deny a humane provision of the law because it may sometime be abused.

Experience and common sense teaches that the sane of today, may become the insane of tomorrow. Shall one who has once been declared sane, be denied the right of inquisition if he afterward become insane in fact? Since when has this court denied repeated review of the same case, either criminal or civil? This absurd proposition should find no place in the judicial lore of this state.

The majority opinion recites: "We do not wish to be understood as either approving or disapproving the manner in which the inquiry was carried on in the trial court." This concedes, for the purposes of this case, that the defendant did not have a fair trial, and that he may be insane. In other words, the effect of the holding is, that no matter how unfair and unjust the trial, or that the defendant be in fact insane, the execution must take place, and this court is without power to render justice, or to prevent the unspeakable wrong in executing an insane person.

It is said in the majority opinion that it is doubtful if the record here presented would authorize us to act in the premises.

It is not assumed by counsel for defendant, that the record is sufficient, but on the contrary the motion seeks permission to bring here a sufficient record for the consideration of the court.

This proceeding is in no sense criminal in its nature and, therefore, a bill of exceptions is not required. It is simply an inquisition, commanded by the law in such a case to determine the sanity of the defendant. But the record before us discloses every conceivable effort upon the part of counsel for defendant to secure a record, all of which were denied by the trial court.

The court denied permission to file a motion for a new trial, or to consider the errors alleged therein, or to authorize any sort of record for review. Under this state of facts, if we are to hold the record before us, is insufficient, then we should authorize and direct a proper one.

I proceed to consideration of the authorities relied on in the majority opinion. These cases are: *State v. Nordstrum*, 21 Wash. 403, 58 Pac. 248, 53 L. Ed. 584; *Nobles v. Georgia*, 168 U. S. 398, 42 L. Ed. 515, 18 Sup. Ct. 87; *Crocker v. State*, 60 Wis. 553, 19 N. W. 435; *Baugh v. State*, 100 Geo. 554, 28 S. E. 68, 38 L. R. A. 577; and *Ex Parte v. State*, 50 Ala. 489, 43 So. 490, 10 L. R. A. (N. S.) 1129, 124 Am. St. 79.

In *State v. Nordstrum, supra,* the opinion recites:

"The question presented for our determination is one of first impression in this court. It is conceded that no method of procedure in cases like the present is provided by statute in this state. The question as to whether the action of the court below which is objected to by appellant is reviewable by this court involves somewhat the question whether the appellant had or had not the right to have the question of his present mental condition ascertained by a regular trial, either before a jury or in some other method known to the law."

There was no statute covering the subject, and the case was tried under the rule of the common law. The denial of the right of review in that case was upon the sole ground that the appellant had no statutory right to have the question of his present mental condition ascertained by a trial, either by jury or some other method known to the law. In the present case the statutory right to a trial by jury in the same court where defendant was convicted of the crime is unquestioned. The case does not support the position assumed by the majority of this court, but, on the contrary, is a forceful support of the principle for which I am contending.

In that case and under the authority of the common law, and as a matter of favor, "The court, in order to satisfy its mind and conscience as to the sanity or insanity of the defendant, appointed a commission consisting of five expert physicians and alienists to examine the defendant and to report to the court his present mental condition." The defendant was without counsel. It was not a judicial proceeding, as under our law.

The case of *Nobles v. Georgia, supra,* involved the question of re-sentence by the trial court, of the defendant, whose execution had been stayed because of insanity occurring after conviction, and it was held that such re-sentence was not a denial of due process of law, being in substantial compliance with the then existing statute of the state of Georgia. The statute provided that if the convict, sentenced to death, afterward becomes insane; the sheriff shall summon a jury of twelve men to inquire into his sanity, and, if found to be insane by such jury, the sheriff shall suspend execution and report his action to the trial judge, who was required to enter such report on the minutes of the court.

The statute further provided, that when it shall afterward appear to the trial judge that the convict was of sound mind the judge should issue a new warrant directing the execution. This the judge did in that case. It will be observed that the statute directed the sheriff to cause such an examination, and the proceeding was not before the court in any sense, required no consideration of the court, and the court in that case held that the proceeding was not a judicial one, and, for such reason, the right of review did not exist.

The reasoning of the court was that the statute did not give an absolute right on the part of the convict to have the issue tried before the court, and to a jury, but addressed itself to the discretion of the trial judge, and that in the

absence of such legislation the procedure was ruled by the common law. Our statute on the contrary provides that the issue shall be tried before a court, and to a jury. The case does not support the majority view in this case. The language quoted from this case in the majority opinion concerning the frequency with which such suggestions of insanity might be made, was applied solely to the discretionary proceeding, under the Georgia statute, and did not apply to a judicial proceeding such as is provided by our statute. The Supreme Court of the United States in that case, as is the rule, simply adopted the construction of the statute placed upon it by the Supreme Court of the state.

But, by the act of the legislature of Georgia the statute considered in the *Nobles* case, was amended and it was provided that in case the convict shall become insane after sentence of death, that upon the oath of a practicing physician, the question of his sanity shall be tried by the Superior Court of the county and shall be entitled to a jury. The statute as amended is very similar to ours. In the case of *Sears as next Friend v. State*, 112 Ga. 382, 37 S. E. 443, the amended statute was considered. In that case the trial court dismissed the application of the convict for a hearing upon his sanity. This judgment of the trial court was upon error to the Supreme Court, reversed and such hearing commanded.

It was said in that case that, "The act itself does not seem to leave but one thing discretionary with the judge, and that is the right to appoint a special term for such trial." The Supreme Court of Georgia in so passing upon a similar statute to ours, is an authority plainly and positively opposed to the view of the majority of the court in this case.

The case of *Crocker v. State, supra,* is not authority at all in the case before us. Crocker was being tried for a minor offense; she had not been convicted. Pending the trial an application was made for an inquisition in lunacy

as provided by the Wisconsin statute. The court impaneled a jury to try the question of the prisoner's sanity. The jury rendered a verdict that the prisoner was insane, the trial was indefinitely postponed, and the court ordered the prisoner to be committed to the asylum to await her recovery, and upon which she was to be delivered to the sheriff to be dealt with according to law. The state sued out a writ of error to review the action of the court. It was held that the writ of error was improvidently issued. This ruling was based on the statute in such a case. The reasoning of the court may be best stated by quoting from the opinion as follows:

"Our statute has adopted substantially the same practice. It provides that when any person is indicted or informed against for any offense, if the court shall be informed in any manner that there is a probability that such accused person is, at the time of his trial, insane, and thereby incapacitated to act for himself, the court shall, *in a summary manner*, make inquisition thereof, by a jury or otherwise, as it deems most proper; and if it shall be thereby determined that such accused person is so insane, his trial for such offense shall be postponed indefinitely, and the court shall thereupon order that he be confined in one of the state hospitals for the insane, etc., R. S. §4700. Here the proceedings were strictly in accordance with the statute. The validity of the statute is not questioned. By it, if not without it, the court was authorized, in a summary manner, to make inquisition of the then present insanity of the prisoner, by a jury or otherwise, as it deemed most proper. The inquisition had was only preliminary to the trial of the offense. It had no bearing upon the guilt or innocence of the prisoner. In *Re J. B.* 1 Mylne & C. 538. It was entirely collateral to the main trial, which was indefinitely postponed until the prisoner's sanity and capacity to act for herself on such trial should

be restored. The statute certainly did not give a jury trial as a matter of right upon such collateral issue. It says 'the court shall make inquisition thereof in a summary manner, by jury or otherwise, as it deems most proper.' Undoubtedly it may, in a proper case, make such inquisition by a medical commission or otherwise. The *method* of making inquisition is left *to the discretion of the court.*"

The trial in that case was not by a jury, and before the court as a matter of right, as here.

It is to be noted that of all the cases cited in the majority opinion to sustain the conclusion that the right of review does not exist, but one, the Wisconsin case denied such right and dismissed the proceeding. In all others, the appellate courts entered upon a review.

In no case cited in the opinion, or in the briefs, nor have I been able to find one, where in case of a statute of similar import to the Colorado statute, making the trial of the insanity of one sentenced to be executed, and occurring after judgment, a matter of right, before a court and to a jury, has it been held that the right to review in some form does not exist. In the following cases, review of purely insanity proceedings in criminal cases, either before or after judgment, was allowed by appellate courts: *Commonwealth v. Hays*, 195 Pa. St. 270, 45 Atl. 728; *State v. Helm*, 69 Ark. 167, 61 S. W. 915; *Barker v. State*, 75 Neb. 298, 103 N. W. 540; *In re Maas Guardian*, 10 Okl. 302, 61 Pac. 1057.

The errors upon the trial are to my mind, very serious, so much so as to preclude a fair and just trial, and I refer briefly, to some of them. A trial of such character should be as free from connection with the facts of the crime, the former trial and conviction, as may be possible. It is simply a trial of the question of defendant's sanity at the time of the insanity hearing, and he should not be prejudiced by details of his crime, and by appeals for punishment or vengeance.

From the record before us it appears that the defendant was in effect, subjected to a second trial for his offense, with but little regard for his alleged present infirmity.

The jurors upon their *voir dire* were questioned as to their conscientious scruples for or against capital punishment, and otherwise subjected to such examination as may only be proper in the trial of a capital case. The court held that the burden was upon the defendant to establish his sanity. Notwithstanding this, the court refused the defendant the right to open and close the argument. The effect of such an unprecedented ruling of the court, is more apparent when considered in connection with the argument of the District Attorney, and the refusal of the court to interfere with it.

Notwithstanding the uniform authority holding that the sole question to be considered is insanity at the time of the insanity trial, and occurring after the criminal trial, yet the District Attorney was permitted to argue defendant's guilt of the crime, of which he was convicted. The District Attorney, in his opening argument, was permitted to say, among other things:

"Now, in this case we find this sort of a situation: that there was a trial upon the merits of the killing, and in that trial the defense of insanity was introduced, and that was the defense that was made to that jury of twelve men, and they sat here from the 27th day of July, 1914, to the 5th day of August, 1914, and heard the testimony; and you will have noticed by this time that I asked these various witnesses if they didn't testify in that case, and in nearly every instance, with but few exceptions, the witnesses were all the same as appeared before that jury, and that jury had to determine beyond reasonable doubt, whereas you only have to determine from a preponderance of the evidence; and yet, that jury having heard all that evidence, having had the defense of insanity before it, found beyond a reasonable

doubt that the defendant under those circumstances, and under that evidence was sane. That, it seems to me, is a powerful argument, coupled with the presumption that he is presumed to be sane anyway. Starting with that presumption, that he is presumed to be sane, a jury of his peers sat in this jury box, and under practically the same evidence as here introduced found a verdict which said that he was sane beyond a reasonable doubt; and all you have to find is that he is sane, by the preponderance of the evidence; or, to state the converse of it, you cannot find that he is insane, unless you believe there is a preponderance of evidence here sustaining that proposition. _

Following that, the evidence shows that a motion was made for a new trial to the judge—that is, an appeal was made to the judge that the jury had not done right, and the record introduced in evidence here shows that the court denied the motion for a new trial, thereby setting his seal of approval upon the acts and conduct of the verdict of that jury when it found beyond a reasonable doubt that he was sane. Therefore, that court, sitting upon the bench and having heard the evidence, the same as the jury, sustained the verdict, and thereby found that, in his judgment, the defendant was sane beyond a reasonable doubt. And then this case was taken to the Supreme Court of this State, and all the evidence that was introduced before the jury was taken up there in typewritten form, and that court considered the case, considered the evidence, read the instructions given in the court below, read the verdict of the jury and listened to the arguments of the attorneys who appeared there to argue the case. That court, after a full consideration of the matter, affirmed the verdict of this jury, affirmed the judgment of this court, and that Supreme Court, said that, beyond a reasonable doubt, this defendant was sane and must be punished for his offense; and they fixed the time of the execution. Are not those three things of power-

ful importance in this case, gentlemen of the jury, outside of the question of re-trying and the expediency of re-trying matters that have once been determined by juries and courts, and that there ought not to be allowed, in this or in any other community, the re-trial of something that the jury has determined, that the court has approved of, and'that the Supreme Court has affirmed? Outside of that, is it not a powerful factor that twelve men like you sat in this jury box, and hearing all the evidence and law given by the judge, they said that beyond a reasonable doubt this man was sane, and that the court who sat here and heard all the evidence and gave the instructions said that beyond a reasonable doubt he was sane, and that the Supreme Court, in reading all of the evidence and hearing the arguments of learned counsel, affirmed that verdict and that judgment, and reiterated that he was sane, and that he was guilty, and that he ought to be punished, as the verdict of that jury found."

The District Attorney then entered upon an argument as to defendant's guilt of the crime. Objections of counsel to this sort of argument were persistently made and consistently overruled by the court. The record discloses the following astounding proceeding upon this argument:

"Mr. Rush: And so I say, there is nothing of paranoia or of delusion there; nothing of spies, because Bulger was angry because he had not been protected as he thought he should have been when he got licked in the hotel. He was angry because the manager put him out, and when he saw they called a policeman to put him out and ruin his reputation for valor, his high honor as the colonel of a regiment he was organizing to really fight, he says, 'I have to do something. They have "called" me; they have "called" my bluff,' and so to demonstrate his valor, he walks around and kills Mr. Nicodemus.

No, there is no paranoia there, gentlemen of the jury,

and your fellow jurors that sat here sixteen or eighteen months ago in this box and heard this same story, decided beyond a reasonable doubt, that there was no insanity in that act, but that it was a sane act, beyond a reasonable doubt.

Mr. Nye: Now, your Honor, I insist that counsel is entirely without his province in commenting upon the verdict of that jury in that way in this argument, and I object to it most strenuously.

The Court: The court does not see how, under the evidence in this case, that can be eliminated, Mr. Nye."

This argument proceeded as follows:

"There is one other thing I want to mention: After the Supreme Court passed on this matter and affirmed the verdict of the jury, they went before the Governor and before the Board of Pardons, and after they presented the matter to the Governor and the Pardons Board, they refused to interfere. Why? Because, evidently, they didn't believe anything about this insanity business. And Bulger wrote a letter to the governor, and it is as direct, it is as original, and it is as reasoning as any letter could ever have been written by any man.

And so, gentlemen of the jury, taking into consideration all these facts, that any of these things were delusions, the fact that these alienists upon their own side said that if you limit these matters to whether he knew right from wrong and acted accordingly, and that he realized his present impending punishment, that they had to say—that they couldn't say that he was insane; and the alienists for the State, under those circumstances, said they would have to say that he was sane; taking further into consideration that the jury upon this same evidence, sixteen or seventeen months ago, decided that he was sane; that the judge upon the bench afterwards affirmed that decision and held the defendant to be sane; that the Supreme Court of the State

affirmed that decision, after reading all the evidence, and they said he was sane and ought to be punished; and further, that the Board of Pardons and the Governor had it presented to them, and they said the same thing,—I say taking all those things into consideration, is there any evidence here, by a preponderance of it, that shows that he is insane?

Gentlemen of the jury, I submit that you would be derelict in your duty if you should overturn the verdicts of juries, and the judgments of courts, without more evidence than is presented, and upon such flimsy evidence as we find here before us."

Worse than the error of the District Attorney was the error of the trial court in placing his voice of approval thereon. It is inconceivable that the jury can have exercised its own judgment, when they were told by the District Attorney, with the expressed approval of the court, that if they were to find the defendant insane, they must overturn the verdict of the jury in the criminal case, set aside the judgment of the trial court in that case, overrule the decision of the Supreme Court, and that the Supreme Court, "said he was sane and ought to be punished," and "overrule the Governor and the Board of Pardons."

Under such circumstances, and so told and instructed, it would seem that the jury were precluded from finding the defendant insane, no matter what their individual convictions may have been. It would have at least saved reflection upon our judicial procedure, if the court had denied argument, and arbitrarily, and in the face of the statute, instructed the jury to return a verdict finding the defendant sane.

This sort of argument was repeated in the closing argument of the District Attorney, in, if anything, more flagrant violation of propriety and justice. I quote the following:

"I take it, if it pleases you, that Arnett's duty was to see whether there was anything in this man that indicated

insanity and ascertain what the facts were. Mr. Nye said he regretted that it was his duty to act both as attorney and as witness; that he was compelled to go upon the stand in his client's behalf. Then, in the name of God, why didn't he put his client on the stand, if he thought he would gain by it? Why didn't he put his client on?

Mr. Nye: If the court pleases, counsel has no right under the law, to comment on the failure of Bulger to take the stand, and I object to the remark of counsel.

The Court: The court will not interrupt counsel in his argument. The jury must be the judges of the conflicting evidence in this case.

Mr. Nye: Note an exception.

Mr. Rush: They say here that if he has a delusion it will crop out. Why didn't they put him on the stand and let it crop out. They knew it wouldn't do to let it crop out; that's why they didn't put him on the stand.

Mr. Nye: Again I object. Counsel has no right to make any such charge against counsel for Mr. Bulger.

The Court: The court will not interfere with counsel."

That all this could, or did, occur in an insanity inquisition, where the insanity of the person is alleged to have occurred after conviction, and after sentence of death, is so amazing as to tax belief, but for the record.

If the burden may be said to be upon the convict in such a proceeding, then it was a violation of all rule and precedent to take from him the right to open and close the argument. Under the circumstances of this case the result could not be otherwise than to greatly prejudice, not only the defendant but the state itself, which has declared the right to a fair and just trial of the sanity of the prisoner, to the end that if he be insane he shall not be executed while so afflicted.

The guaranty of a fair trial in such a case, is of vastly greater importance, in the protection of the honor of the state, than to the defendant. The right to open and close is

a substantial right. To confer the right upon one not entitled to it, or to impose the duty upon one not under the duty, is error, and where one is required to go forward, after objection, it does not constitute a waiver of his right. —*Little v. Little,* 23 Colo. App. 518, 130 Pac. 1022.

Again, and for the stated reason that it would save expense and time, the court expressly ordered that the witnesses be limited in number to three expert, and six non-expert witnesses on each side. Upon objection to this order the court said in reply, "The authorities have nothing to do with the case. The only authority that has anything to do with it is talking to you now from this bench. No authorities have anything to do with this case." And again, "No, there is no burden. You have no affirmative; you have no burden of proof; you have no law; the authorities have nothing to do with it; it is purely a matter of favor. The court is regulating it in its own way, as to the sense of the proprieties."

. I insist that the law, reason, and justice do have something to do with such a trial.

In the case of *State v. Gideon,* 119 Mo. 94, 24 S. W. 748, 41 Am. St. 634, a greatly celebrated and revered jurist, Judge Gannt, said of the assumed right of a trial judge to limit the number of witnesses in a criminal trial:

"It was never intended that one charged with crime should be subjected to such an inquisition proceeding, when he was merely exercising his natural and constitutional right of preparing to meet a public prosecution. The terms imposed are, to say the least, most unusual, and are far in excess of the statute. * * * The proposition has only to be stated to be condemned as utterly at variance with the practice in criminal trials in our courts. It is true that, as the population of this state increases, crime increases, and large sums are yearly paid out by the state for costs in criminal cases; but it is not, and never has been, the policy

of the state to let a few paltry dollars outweigh the life or liberty of the citizen. It were far better that twice the amount now paid annually should be expended in one case, rather than it should be said that an innocent man was convicted and hanged because the state denied him process for his witnesses by which to establish his innocence."

It is within the knowledge of the justices of this court, that the alleged acts and conduct of Bulger, upon which his alleged insanity was based, covered different countries, and a long period of years; this from the record in the criminal case. If the rule laid down by Judge Gannt is, as I believe, accepted in all jurisdictions as the rule in criminal trials, it applies with more than equal force in the present case. As the trial court well said, such action was "without authority of law," and seemingly without precedent.

Defendant's counsel offered to produce witnesses of reputed high character, whose testimony was rejected.

Clearly prejudicial was the refusal of the court to admit the testimony of the warden of the county jail, who had charge of Bulger during his long term of imprisonment.

There appears in the record here, the affidavit of six of the jurors in which it is set forth that the matter was submitted to the jury at 6:45 p. m. on January 8th, that the jury continuously considered the case, in hopeless disagreement until 2 o'clock p. m. on January 10th, or for more than forty-three hours, at which time the jury submitted the following question: "Does the law in the instructions permit the consideration of a doubt; if so who is entitled to the benefit of the doubt," and thereupon the jury was instructed as follows:

"The court instructs the jury in answer to the written inquiry by your foreman that in entering upon this inquiry the presumption of law is that the prisoner, James C. Bulger is sane, and this presumption continues, unless you believe that his insanity at this time has been established by a pre-

ponderance of the evidence in this proceeding, when taken and considered as a whole.

You are further instructed that the question of reasonable doubt—that is, of giving a defendant on trial in a criminal case the benefit of any reasonable doubt—does not enter in this proceeding."

The affidavit further recites: "That had the court's instructions enabled the jury to give the benefit of any reasonable doubt to defendant, the verdict would have been 'insane' or no agreement would have been reached." Thus, notwithstanding all errors above set forth, and others not considered, it was this instruction that finally induced the verdict. The instruction was both misleading and erroneous.

While I am not prepared to say that the person in such a proceeding is required to raise only the "reasonable doubt" in the sense used upon a criminal trial, yet the law requires that the mind of the juror shall be satisfied.

The instruction placing absolutely and without qualification, the burden on the defendant, to "establish by a preponderance of the evidence," his sanity, was clearly erroneous, and is not supported by any authority which I am able to find. In the sense as commonly understood, the trial was neither civil nor criminal, and the rules of proof in this respect, in neither case, are applicable.

There are many persons whom the average mind and judgment, will declare to be insane, without the slightest testimony, save that of the appearance, words, acts and conduct of the insane person. And this is an element, and frequently a controlling element, that enters into every insane inquisition. The preponderance of the testimony alone cannot control in such a case. The real guide for the juror is, does all the proof satisfy your mind that the man is insane in the sense that the law may not command his execution. That is to say he is capable of understanding the nature and objection of the proceeding against him; if he has not been

tried for the crime, is he mentally capable to conduct his defense in a rational manner; does he comprehend the reason and purpose of his pending execution. In this sense the minds of the jury should be fully satisfied of the sanity of the condemned, and not be encumbered with a doubt, finding its basis in reason and judgment.

In the case of *United States v. Lancaster*, 7 Bissell, 440, Fed. Cas. No. 15,555, the court instructed the jury upon this question as follows:

"While the burden of proof may be said to be on the defendant, to satisfy you that he is in fact insane, yet, if the proof, when all considered together, leaves a reasonable doubt upon your mind of this man's sanity, he should have the benefit of the doubt. That is to say, no man should be considered as a proper subject for criminal prosecution of whose sanity there is ground for a reasonable doubt."

I offer no opinion upon the question of the sanity of the defendant, but I do affirm that the question has not been fairly or justly tried, and am convinced that his trial in that respect stands without precedent or parallel, in our jurisprudence. Neither can I believe that it can be sanctioned by the letter or spirit of the law, nor by the conscience of an enlightened civilization.

The law of civilized nations since the dawn of history, has condemned the execution of an insane man, no matter what the enormity of his crime. Modern civilization, the dictates of humanity, and I hold, our law, commands a fair trial of the issue.

I can only hope for the day when courts of justice will decline to dig among the tombs of a dead past for ancient and obsolete precedent, particularly a precedent adopted in a day when a majority of the people believed the insane to be possessed of the devil, and when governments hung them as witches; when they will refuse to be shackled by a procedure that finds neither reason nor justice in our day and

time; when the law will be treated as a philosophy to be applied to the ever changing conditions of man, and not a straight-jacket with no leeway for the exercise of common justice; when there will be more of social justice, and less of legal justice; when the letter of our law will be read in the light of its spirit and purpose; when the spirit of our government will partake less of that of a Roman emperor, and more of that of the Prince of Peace.