## IN THE MATTER OF FREDERICK LANG, ALLEGED TO BE INSANE.

Submitted October 2, 1908—Decided November 5, 1908.

Section 13 of "An act concerning the commitment of insane persons into institutions for the care and treatment of the insane in this state, their confinement therein and their support while so confined," provides that "if any person in confinement under commitment, indictment or sentence or under any other process, shall appear to be insane," a judicial inquiry shall be had, and, if insanity be found, such person shall be committed to an asylum until restored to reason, &c. *Held*, that in the case of one convicted of murder in the first degree and sentenced to death, the statute does not alter the common-law rule that to prevent the execution of such sentences the insanity must be of such character as to render the prisoner incapable of understanding the nature of the proceedings against him, and his impending fate and execution.

On *certiorari*.

Before Justices GARRISON, SWAYZE and PARKER.

For the prosecutor, *Alan H. Strong*.

*Contra, George Berdine,* prosecutor of the pleas of Middlesex county.

The opinion of the court was delivered by

PARKER, J.   The present proceeding is in form a *certiorari* directed to the Hon. Theodore B. Booraem, judge of the Court of Common Pleas of Middlesex county, and brings up an inquiry had before him pursuant to section 13 of the act entitled "An act concerning the commitment of insane persons into institutions for the cure and treatment of the insane in this state, their confinement therein and their support while so confined."   *Pamph. L.* 1906, *pp.* 715, 722.

Frederick Lang, the prisoner, had been convicted in the Middlesex Oyer of murder in the first degree, and was confined in the Middlesex county jail under sentence of death when an application was presented by the warden of said jail pursuant to section 13 already referred to, alleging that the prisoner was insane; the judge thereupon instituted an inquiry and proceeded to take proofs as to the insanity of the prisoner as required by the act.   A jury was called in, evidence taken in open court in the presence of counsel for the prisoner, and the jury having been charged by the court as to the law, returned a verdict that the prisoner was sane; and thereupon the judge made an order reciting these proceedings, and finding and determining upon the said verdict and pursuant to the statute that the said Frederick Lang was sane. The prosecutor's claim is that this order was illegally entered because the test of insanity laid down by the judge in his charge to the jury was erroneous.   This is the sole ground alleged for setting aside the proceedings.

Without deciding whether *certiorari* is the proper form of review for a proceeding of this kind, or whether it can be re-

viewed at all, we have thought it best in view of the importance of the question raised to decide it upon its merits. Stated shortly, the question for decision is whether under the circumstances the test of insanity is that laid down by the common law or whether it had been modified by statute. The judge in charging the jury laid down the test of insanity in the following language:

"If, therefore, a person sentenced for a crime is capable of understanding the nature and object of the proceedings going on against him, if he rightly comprehends his own condition in reference to such proceedings and can conduct his defence in a rational manner, he is, for the purpose of undergoing punishment, deemed to be sane, although on some other subjects his mind may be deranged or unsound. If the prisoner has not, at the present time, from the defects of his faculties, sufficient intelligence to understand the nature of these proceedings against him, and his impending fate and execution, the jury ought to find that he is not sane, and upon such finding he may be ordered to be kept in custody until his disability is removed."

The judge also dealt with a request which had been presented on behalf of Lang, as follows:

"I have been requested by Mr. Strong to charge you as follows: 'If the mental condition of the defendant is such as would have made it proper that he should be committed to an insane asylum in case he had not been convicted or accused of crime the jury should find that he is insane.' I decline to charge you to that effect, as, in my mind, that is not the law of the land. A man may be insane and commit a crime and yet know the difference between right and wrong. He may be insane on one subject and commit a crime in no respect connected with the special species of insanity that he is afflicted with. So a man may be insane after trial and after judgment and be a fit subject to be committed to an insane asylum, yet, if his sanity be only partial and he be able to comprehend, as I have said, the situation, and know the nature of the proceedings that are being taken against him, and can understand and appreciate his fate and intelligently

confer with his counsel, he cannot claim immunity from punishment."

To the portions of the charge above quoted and to the refusal to charge as requested, exceptions were duly noted.

Counsel for the prosecutor concedes that the portion of the charge above quoted and the ruling on the request are entirely in accordance with the rules of the common law; and indeed this is obvious.    4 *Bl.* 25; *Freeman* v. *The People,* 4 *Denio* 9.

It is argued, however, that this common-law test has been changed by statute in this state, and this on two grounds—*first,* that the definition of insanity contained in the Lunatic Asylum act of 1847, although not embodied in the act of 1906, is still in force and should be applied to that act; *secondly,* that as the act of 1906 provides for the first time a comprehensive schedule with regard to the commitment to asylums of lunatics of every class, criminal or otherwise, including persons in confinement and under sentence of any kind, the same test of insanity is necessarily applied to criminal lunatics under sentence as would justify the commitment to an asylum of any lawful citizen, either for the purpose of treatment, and, if possible, cure, or to insure the public safety. We have given to both these propositions the full consideration that the importance of the case demands, and find ourselves unable to sustain either of them.

The last section of the Lunatic Asylum act of 1847 (*Nix. Dig.* 1868, *p.* 522; *Rev., p.* 607) contains the following definition of insanity : "The terms 'lunatic,' 'insane,' as used in this act, include every species of insanity and extend to all deranged persons and to all of unsound minds other than idiots." The same section is re-enacted in the act of 1893, which was a general revision of the Lunatic Asylum act, and will be found as section 47 of that act. *Gen. Stat., p.* 1989.

It will be observed, however, that the definition is restricted to the acts in question, and neither act applies to murderers condemned to death. Section 28 of the original act of 1847 (*Nix. Dig., p.* 526) corresponds in many features to section 13 of the act of 1906, under which the proceedings now under review were had, and begins as follows :

"If any person in confinement, under indictment, or under sentence of imprisonment, or for want of bail for good behavior, or for keeping the peace, or appearing as a witness, or in consequence of any summary conviction, or by way of any test, or under any other than civil process, shall appear to be insane, the judge of the Circuit Court of the county where he is confined shall institute a careful investigation," &c.

So that at the time of the passage of this act section 28 extended to convicted criminals under sentence of imprisonment, but not to those under sentence of death. The clause "or under sentence of imprisonment" was eliminated from the act of 1847 in the next year (*Nix. Dig., p. 529, pl. 72*), so that from 1848 down to 1906 the transfer to asylums of insane persons under sentence of imprisonment was regulated, if at all, by other statutes hereinafter referred to. And at no time until the act of 1906 does there appear to be any statutory provision regulating the procedure in the case of murderers condemned to death; and this was the state of the law at the time of the investigation of the insanity of one Clifford, a condemned murderer, by the late Justice Lippincott in 1899 (*22 N. J. L. J. 176*), on which occasion the investigation was had by the judge without a jury and the determination arrived at by the rules of the common law. At that time the Criminal Procedure act of 1898 was in force, and sections 169 and 172 (*Pamph. L., pp. 924, 927*) provided, respectively, for the examination and removal, in proper cases, of convicts confined in county institutions or the state prison, as the case might be, section 172 being merely a re-enactment of the amendment of section 8 of the State Prison act of 1876, found in *Gen. Stat., p. 3155, pl. 19*, and neither section, of course, applying to those under sentence of death.

Counsel for the prisoner in this case maintains that while the act of 1906 is essentially a revision of all the preceding legislation in regard to these matters, it does not have the effect of repealing section 41 of the act of 1847, defining insanity, as re-enacted in 1893, and that that section is still in force, and should be resorted to as prescribing the proper test of insanity for any case coming under the act of 1906, and

especially the present case. Our view, however, is to the contrary. Not only was the statutory definition of insanity by its terms confined to cases arising under the act in which it was contained, and therefore not applicable to cases arising under any other act, except a supplement or amendment, which the act of 1906 is not, but we think also that the course pursued by the legislature when enacting the revision of 1906 as a general revision of all these matters, in expressly omitting any definition of insanity, is significant as indicating the intention of the lawmakers not to disturb the existing law in that regard. Our conclusion, therefore, is that, so far at least as relates to cases like the present, the statutory definition of insanity, even if now in force and unrepealed, has no application.

The other argument is that as the act of 1906 is a comprehensive scheme, using the words "insane" and "insanity" in reference to all classes of persons mentally deranged, whether criminal or otherwise, including convicts under sentence, it intends that the same test of insanity should be applied to all, and that if the inquiry had been conducted in relation to the prisoner as if he were a lawful citizen, the jury must have found, on the evidence submitted, that he was insane, and this would lead to his commitment to an asylum instead of his execution.

Conceding for present purposes that the evidence before the jury was such that they must have found a verdict of insanity in the case of a lawful citizen, we cannot agree that the legislature intended the same test of insanity to be made the ground of deferring execution indefinitely in a case like the present. On this branch of the case the omission of any definition of insanity from the statute is equally significant as on the other. It is, of course, entirely proper that a lawful citizen, or one accused of crime awaiting trial, or convicted of crime punishable by imprisonment, who is mentally deranged in any way, should be transferred to an asylum for treatment, and, if possible, cure, and also as a measure of protection to the public or his fellow-prisoners, as the case may be. He has his life to lead, and public policy requires

*48 Vroom.* In re Lang.

that he should be treated so as to lead it to the best advantage on his release, if a prisoner, from his imprisonment. But the case of a murderer sentenced to death is different. His life is forfeited, and we are not willing to adopt the view that in cases where the law has decreed that a murderer should be put to death and the court or a jury has found that he is conscious of having committed a crime, is aware that he is amenable to punishment and is appreciative of his situation as a murderer condemned to death, he shall be permitted to escape just punishment because of a mental infirmity which has no bearing on any of these features of the case.

If this be the law, the capacity to distinguish between right and wrong with respect to an act of murder would become for all practical purposes an academic question in cases of murder committed under the influence of an irresistible impulse, as in *State* v. *Graves,* 5 *N. J. L. J.* 54; *Mackin* v. *State,* 30 *Vroom* 495, and *Genz* v. *State, Id.* 488, if it could be shown in an investigation under the statute that such impulse was due to mental derangement still persisting; or, indeed, if any other mental derangement, however insignificant or irrelevant, could be made to appear. We should not be willing to say that the legislature intended to enact such a drastic change in our jurisprudence without some definite evidence of that intent, and such evidence we fail to find in the statute under consideration.

We think a close examination of the act of 1906 in all its features will show that its intention was not to make any change in the existing tests of insanity, but rather to draw into a general scheme of procedure all cases in which by the existing law commitment to an asylum is called for. In the main it is a re-enactment of former legislation with the addition of requirements in every case and in many cases where such requirements did not previously exist relating to the making out of applications and the form of such applications, where they are to be filed, to whom delivered, and so on. We conclude, therefore, that the words "insane" and "insanity," as used in the acts of 1906, have a meaning which varies with the particular case coming within the purview of the act, and

that that meaning in the present case is unchanged from its common-law meaning, and was clearly and accurately stated by the judge in his charge to the jury, part of which is above quoted.

The order brought up by the writ will therefore be affirmed.