(No. 2154.   Dec. 4, 1918.)

IN RE SMITH.

SYLLABUS BY THE COURT.

1.   Chapter 70, Code 1915, which provides for the issuance by a district judge of a commission in the nature of a writ de lunatico inquiriendo to inquire into the lunacy or habitual drunkenness of any person within this state, or having real or personal estate therein, has no application to a person in the custody of the law awaiting execution for a capital offense or as to a convict undergoing imprisonment for crime.   Said statute was enacted solely for the purpose of protecting the civil and property rights of insane persons and habitual drunkards and for the care of indigent persons by the various counties.   Hence an adjudication by a district court under such statute that a person who has been tried and convicted for the crime of murder and sentenced to death is a person of unsound mind is void, and does not have the effect to stay the execution.          P. 51

2.   The common law forbids the trial, sentencing, or execution of an insane person for a crime while he continues in that state.   Where a person has been convicted of a crime and sentenced to death, and, pending the execution, a suggestion is made to the court so passing sentence that the accused has become insane, and the court is satisfied from such suggestion that there is a question as to the sanity of such party, the court will, as a matter of humanity, make such investigation as may be necessary to become informed as to the sanity or insanity of such party.          P. 57

3.   The court has the power to grant a stay of execution

In re Smith, 25 N. M. 48.

in such case for the purpose of enabling it to inquire into the sanity of one about to be executed.            ·            P. 57

4. The trial of the question of the sanity of a convict, suggested after the verdict and sentence, is at common law in the discretion of the judge, without an absolute right on the convict's part to have the issue tried before a court and a jury. In this jurisdiction, there being no statute upon the subject, it is within the province of the court, upon the suggestion of the insanity of one awaiting execution under a death sentence, to adopt such method as to the court seems best suited to enable it to arrive at the truth of the question.
P. 57

5. The test of the question as to whether one about to be executed is sane or insane is whether or not such person, at the time of the examination, from the defects of his faculties, has sufficient intelligence to understand the nature of the proceedings against him, what he was tried for, the purpose of his punishment, the impending fate which awaits him, and a sufficient understanding to know any fact which might exist which would make his punishment unjust or unlawful, and the intelligence requisite to convey such information to his attorneys or the court. If he has, then he is sane; otherwise he is insane, and should not be executed.
P. 59

6. Evidence examined, and held, that petitioner is now sane within the rule above stated, and that his execution should not be further stayed.                           P. 61

A. B. Smith, alias Dashley, petitioned the Supreme Court to stay the execution of his sentence to death after conviction of murder until he should be restored to his reason. Stay denied.

A. M. EDWARDS, of Santa Fe, for petitioner.

HARRY PATTON, Atty. Gen., and C. A. HATCH, Asst. Atty. Gen., for the State.

OPINION OF THE COURT.            ·

ROBERTS, J.   Petitioner, A. B. Smith, alias Dashley, was tried and convicted in the district court of Dona Ana county of murder in the first degree, and was sentenced to be hanged. He appealed to this court, and on the 15th day of July, 1918, the judgment of the district court was affirmed (State v. Smith, 24 N. M. 405, 174 Pac. 740), and a new judgment was entered in this court sentencing the petitioner as required by law and directing

that the sentence be executed on the 13th day of August, 1918. Thereafter the Governor of the state granted said petitioner a reprieve until the 25th day of October, 1918. The petitioner was removed from the jail of Dona Ana county and placed in the state penitentiary at Santa Fe for safekeeping, and has been confined in the penitentiary continuously since the judgment was entered in the district court of Dona Ana county. On the 10th day of August, 1918, there was issued out of the district court of Santa Fe county a writ de lunatico inquiriendo under the provisions of chapter 70, Code 1915, to inquire into the sanity of said Smith, alias Dashley, and upon such inquiry it was adjudged and decreed by judgment of said court that said Smith, alias Dashley, was a person of unsound mind. On the 18th day of October, 1918, petition was filed by said Smith in this court setting up such adjudication and the further fact that said Smith, alias Dashley, was at such time a person of unsound mind, and asking this court to stay the execution of such sentence of death until said petitioner should be restored to his reason. At the same time this court heard evidence of four physicians as to the sanity or insanity of the petitioner, and the evidence of the warden and assistant warden of the state penitentiary, and, not being advised as to the law in the premises or sufficiently informed as to the facts, an order was entered staying the execution of said sentence until the 29th day of November, 1918. Subsequently a further stay was granted until the 17th day of December, 1918.

At the time of filing the petition, petitioner requested the court to hear evidence and to grant him a stay of execution and further time in order that he might have the opportunity of taking the depositions of some witnesses in other states as to his alleged insanity. He also filed objections to the court hearing evidence on the question, claiming that the result of the investigation conducted by the district court of Santa Fe county was binding and conclusive upon this court. He further moved, in the event the court decided to conduct an investigation, that he be allowed the right to a jury

trial upon the question of his sanity or insanity.   On the 25th day of November, 1918, the court heard further evidence upon the question of the alleged insanity of the petitioner and argument of counsel upon the various questions of law and questions of fact presented.

[1]   The first question logically arising for consideration is as to the effect of the adjudication by the district court of Santa Fe county that petitioner was insane at the time of the hearing in said court.   In this connection it is perhaps advisable to say that at the trial upon the indictment in the district court of Dona Ana county insanity was not interposed as a defense.   The investigation by the district court of Santa Fe county was instituted and conducted under the provisions of chapter 70, Code 1915.   The first section (3378) provides:

"It shall be lawful for any district judge in this state to issue a commission, in term or vacation time in the nature of a writ de lunatico inquiriendo, to inquire into the lunacy or habitual drunkenness of any person within this state, or having real or personal estate therein.   Such commission shall issue in the county in which such person, who is alleged to be a lunatic or habitual drunkard, shall be or reside for the time being.   If such person shall be absent from the state, the commission shall issue in the county wherein he last had his residence, or in which his property is situated, and shall be executed therein."

Section 3379 provides the form of the commission; section 3380 has to do with the petition upon which the inquiry is instituted; and sections 3381 to 3386 inclusive, provide the manner of conducting the investigation.   The contents of these sections need not be stated, and it is sufficient to say that the hearing was conducted in conformity with the provisions of such sections.   Section 3387 reads as follows:

"It shall be lawful for the court, after the return of the inquisition as aforesaid, notwithstanding any traverse of the same that may be pending, to make such orders touching the care and custody of the person, and the management and safe-keeping of the estate of any person, so found to be a lunatic or habitual drunkard, as it shall think necessary and proper."

Section 3388 provides for the appointment of a committee. Section 3393 reads as follows:

"The committee of said person found to be a lunatic or habitual drunkard, shall have the management and control of his person and estate, and shall from time to time apply so much thereof as may be necessary for support and maintenance of himself and family, and for the education of his minor children."

Section 3406 reads:

"Whenever, under a provision of this chapter, a person is found, upon inquisition to be a lunatic or habitual drunkard, and neither himself nor his friends have sufficient personal or real estate for the maintenance of said lunatic or habitual drunkard, he shall be supported at the expense of the county of which he is a resident; but the committee of such poor lunatic or habitual drunkard, shall in all respects conform to the provisions of this chapter."

The remaining sections of the chapter have to do with the management of the estate, reports to the court, etc.

The attorney general contends that this chapter has no application to a person in the custody of the law awaiting execution for a capital offense, or as to a convict undergoing punishment for crime, but that it was enacted solely for the purpose of protecting the civil and property rights of insane persons and for the care of indigent persons by the various counties. The statute was enacted in 1856, long prior to the establishment of the New Mexico Insane Asylum by the Legislature in 1889. With this contention of the Attorney General we agree. There is nothing in the statute showing that it was intended to have any application whatever to persons in the custody of the law undergoing confinement or awaiting execution for crimes. To give to it the effect claimed by petitioner would be to create a conflict of jurisdiction over the person of one awaiting execution for crime. Here the petitioner is under sentence of death pronounced by the Supreme Court for the crime of murder. The sheriff of Dona Ana County must carry the sentence into execution. By an adjudication of lunacy by the district court of Santa Fe county, it is

sought to destroy the effect of the sentence pronounced by this court. A brief consideration of the statute will show that it was not intended to have the application contended for by the petitioner. Section 3387 of the statute gives to the district court conducting the investigation the power to make such orders for the care and custody of the person so found to be a lunatic as it shall think necessary and proper. Section 3393 gives to the committee of such insane person the management and control ''of his person and estate.'' A named individual is in confinement awaiting execution for a capital offense under judgment of a court of competent jurisdiction. The defendant is placed in some other county, as here, in the state penitentiary for safe-keeping. A district court under this statute assumes jurisdiction to hear and determine the question of the lunacy of such defendant. Under the statute it would be the duty of the court to appoint a committee of the person and estate of such lunatic, and the statute gives the committee the cusody of such person. Clearly we think it was not the intention of the Legislature to confer upon a district court power by this statute to conduct such investigation in such cases, and turn the custody of a person in confinement over to a committee. A similar question was presented in the case of Ferguson v. Martineau, 115 Ark. 317, 171 S. W. 472, Ann. Cas. 1916 E, 421. In this state, under a similar statute conferring upon the probate court the jurisdiction to conduct the investigation, one Arthur Hodges was convicted of murder in the first degree. After conviction and while awaiting execution of the sentence an inquiry was instituted in the probate court under the statute as to the sanity of the said Hodges. The result of the investigation was an adjudication of his insanity. After the adjudication an application was made to the chancery court for an injunction against the commissioners of the Arkansas penitentiary restraining them from executing Hodges on the date set for his execution. The chancery court granted the petition and issued an order enjoining the commissioners from executing Hodges. The commissioners applied to the Supreme Court for a writ of prohibition directed to the

judge of the chancery court and to the judge of the county and probate courts theretofore assuming jurisdiction, prohibiting them from interfering with the execution of Hodges on the date set for the same. The judge of the probate court set up in response to the petition that the writ of prohibition should not issue for the reason that the probate court had jurisdiction to conduct the investigation, and that such jurisdiction had been lawfully exercised. The court in disposing of this branch of the case said:

"It is further insisted that the chancery court had jurisdiction to issue the injunction ancillary to or in aid of the jurisdiction of the probate court to enable it to enforce its orders. The chancery court has no such jurisdiction; but, if it were conceded that the chancery court had such jurisdiction, the injunction could not properly issue in aid of the probate court's jurisdiction, for the probate court itself was without jurisdiction. The statute under which the respondents claim that the probate court has jurisdiction, to wit, section 4003 of Kirby Digest, is as follows:

" 'If any person shall give information in writing to such court that any person in his county is an idiot, lunatic, or of unsound mind, and pray than an inquiry thereof be had, the court, if satisfied that there is good cause for the exercise of its jurisdiction, shall cause the person so charged to be brought before such court and inquire into the facts by a jury, if the facts be doubtful.'

"This statute was enacted solely for the purpose of protecting the civil and property rights of insane persons, as is clearly shown by the section itself and the other sections of the same chapter (chapter 83, Kirby's Dig.). It has no reference whatever to determining the issue of the sanity of one who has been convicted and sentenced to be executed for a criminal offense, and who is already in the custody of the law for that purpose."

In the case In re Lang, 77 N. J. Law, 207, 71 Atl. 47, Lang had been convicted of murder in the first degree and sentenced to death. A proceeding was instituted before the judge of the court of common pleas under a statute "concerning the commitment of an insane person into institutions for the cure and treatment of the insane of this state, their confinement therein, and their support while so confined." The jury found the petitioner to be sane, and the matter was removed to the Supreme

Court by certiorari. The court refused to disturb the finding, and an appeal was taken to the Court of Error and Appeals from the judgment of the Supreme Court. The court affirmed the judgment, but said:

"The judgment of the Supreme Court is affirmed, for the reasons set out in the opinion delivered in that court. It is not to be assumed, from the fact of this affirmance or from any language in the opinion adopted, that this court decides that the question of the insanity of a person who is in confinement awaiting execution under a capital sentence can be tested by a proceeding taken under section 13 of the act of 1906 (P. L. p. 722). This question was not argued and not considered." 76 N. J. Law, 829, 72 (Atl.) 1118.

In a later case, In re Herron, 77 N. J. Law, 315, 72 Atl. 133, the Supreme Court of New Jersey held that the insanity of a person who is in confinement awaiting execution under a capital sentence could not be tested by a proceeding taken under section 13 of the act of July 5, 1906 (P. L. 1906, p. 722). The court said:

"Now, as already remarked, in those cases where it is only a question of whether a convict shall be imprisoned in a penitentiary or an asylum, the existence of this power thus put into the hands of a single medical expert, and the failure of the Legislature to indicate any type of insanity, the restoration to which type shall return the prisoner to his former place of imprisonment, matters little, or not at all; but where a sentence is not to imprisonment, but a sentence to death, it seems impossible to believe that the Legislature, under language so general in character, with no allusion to this exceptional situation, intended that the sentenced person should be immune from punishment."

As remarked by the Supreme Court of New Jersey, in considering the statute there in question, if the Legislature intended that the power of removal under section 13 to the insane asylum extended to persons under sentence of death, why not some provision made for a reprieve or stay of the sentence, or why was not some provisions made that the application under section 13 should operate as a stay, coupled with the power of removal? Under our statute no provision is made for staying execution in a capital case where a proceeding is instituted to investigate the sanity of a person or for

the granting of a reprieve, or for the execution of the sentence upon the restoration of the person to sanity. In fact, the statute is silent upon all such questions, and not a word or sentence has any reference whatever to a person awaiting execution or undergoing imprisonment under sentence imposed by a court. For these reasons we are compelled to conclude that the district court of Santa Fe county had no jurisdiction or power to conduct the investigation into the question of the sanity or insanity of the petitioner. This being true, this court was not required to suspend the execution of the death sentence upon the filing in this court of a certified copy of such adjudication, and the petition asking the court to stay the execution must be denied.

All the courts hold, so far as we are advised, that the common law forbids the trial, sentencing, or execution of an insane person for a crime while he continues in that state. Many of the states have statutes to that effect. Cases discussing the question and supporting our view are Freeman v. People, 4 Denio (N.Y.) 9, 47 Am. Dec. 216; State v. Vann, 84 N. C. 722; Bulger v. People, 61 Colo. 187, 156 Pac. 800; Davidson v. Commonwealth, 174 Ky. 789, 192 S. W. 846. In the case of State v. Chretien, 114 La. 81, 38 South, 27, the court, while holding that it was discretionary with the court upon suggestion of the insanity of one about to be executed to take action in the premises, held that in such a case the defendant had no legal right to such action, but that it was a question of humanity. In the case of Nobles v. State of Georgia, 168 U. S. 398, 18 Sup. Ct. 87, 42 L. Ed. 515, the Supreme Court of the United States, in discussing the rule in such a case at common law, said:

"In other words, by the common law, if after conviction and sentence a suggestion of insanity was made, not that the judge to whom it was made should, as a matter of right, proceed to summon a jury and have another trial, but that he should take such action as, in his discretion, he deemed best."

And it quoted from the case of Laros v. Common-

wealth, 84 Pa. 200, where a suggestion of insanity was made after verdict as follows:

"The plea at this stage is only an appeal to the humanity of the court to postpone the punishment until a recovery takes place, or as a merciful dispensation."

In 4 Blackstone, p. 396, the author says:

"Another cause of regular reprieve is, if the defendant becomes non compos between the judgment and the award of execution; for regularly, as was formally observed, though a man be compos when he commits a capital crime, yet if he becomes non compos after, he shall not be indicted; if after indictment, he shall not be convicted; if after conviction, he shall not receive judgment; if after judgment, he shall not be ordered for execution; for 'furiosus solo furore punitur,' and the law knows not but he might have offered some reason, if in his senses, to have stayed these respective proceedings. It is therefore an invariable rule, when any time intervenes between the attainder and the award of execution, to demand of the prisoner what he hath to allege why execution should not be awarded against him; and if he appears to be insane, the judge in his discretion may and ought to reprieve him."

[2, 3] In view of the foregoing and as a matter of humanity, this court felt that the judgment of the district court of Santa Fe county, filed in this court as stated, was a sufficient suggestion to the court that the question of the sanity or insanity of the petitioner should be investigated as a matter of humanity; and in order that the court might have time to hear the evidence and to give the petitioner ample time to produce such evidence as might be available in support of his alleged insanity, a stay of execution was granted him as set out in the statement of facts. That the court had the power to grant the stay for this purpose is supported by the authorities. Bulger v. People, 61 Colo. 187, 156 Pac. 800; Miller's Case, 9 Cow. (N. Y.) 730; Fults v. State, 2 Sneed (Tenn.) 232; State v. Vann, 84 N. C. 722; Parker v. State, 135 Ind. 534, 35 N. E. 179, 23 L. R. A. 859.

[4] The question of the right of the petitioner to a trial by a jury in this court of the question of his alleged insanity must likewise be resolved against him. 16 A. & E. Ency. of Law, 622. In the case of Nobles v. State

of Georgia, supra, the Supreme Court of the United States held that a trial of the question of the insanity of a convict, suggested after the verdict and sentence, is at common law in the discretion of the judge, without an absolute right on his part to have the issue tried before a court and jury. In the case of State v. Nordstrom, 21 Wash. 403, 58 Pac. 248, 53 L. R. A. 584, the court held that where, after sentence of death upon a prisoner, his insanity is alleged, and the court is satisfied itself of the prisoner's sanity, either from its own examination or from that of a commission appointed for the purpose, the action of the court in refusing the prisoner a trial in which he would have the right to be represented by counsel and to examine witnesses was not reviewable on appeal, and approved of the action of the lower court.

In the case of Ex parte Schneider, 21 App. D. C. 433, Schneider had been convicted of murder in the first degree and sentenced to death, and the judgment had been affirmed by the Supreme Court of the District of Columbia. A petition was filed in the court by the prisoner and counsel stating that Schneider "is now insâne," and an order was asked postponing his execution and that the court should institute proceedings to ascertain the truth of this averment. The matter was certified to the general term, which passed an order postponing the execution and directing a method which seemed best suited to prosecute the inquiry. The method adopted was that the court itself decided to hear the evidence as to the alleged insanity of the party and appointed a comission of experts to examine the person so awaiting execution, and heard the evidence pro. and con on the question. In the present state of our law in this jurisdiction, we are of the opinion that it is within the province of the court, upon the suggestion of the insanity of the person awaiting execution under a death sentence, to adopt such method as to the court seems best suited to enable it to arrive at the truth of the question. We decided to hear the evidence upon the question as to the alleged insanity of Smith in open court and fixed a day for such hearing. The evidence was heard as heretofore

stated, and we are now confronted with the question of weighing the same and deciding as to whether Smith should pay the penalty for his crime, or whether the execution of the sentence should be further stayed.

First as to the law in the case: No plea of insanity was interposed as a defense to the prosecution in the trial court, nor was such a plea interposed prior to the judgment. The court instituted inquiry as stated because of a doubt entertained as to the sanity of the accused. The law upon the question as to the degree of insanity which would justify the court in giving to the prisoner a stay of execution may be briefly stated as follows:

[5] If the prisoner has not at the present time, from the defects of his faculties, sufficient intelligence to understand the nature of the proceedings against him, what he was tried for, the purpose of his punishment, the impending fate which awaits him, a sufficient understanding to know any fact which might exist which would make his punishment unjust or unlawful, and the intelligence requisite to convey such information to his attorneys or the court, then he would not be sane and should not be executed. On the other hand, if he fully understands all the facts relative to the crime for which he was tried and the purpose for which he is about to be punished, and can intelligently set forth any fact which may exist as to why the judgment should not be carried into execution, and comprehends his situation and his surroundings, then he would be sane within the law and subject to execution.

In the Matter of Lang, 77 N. J. Law, 207, 71 Atl. 47, the court approved of the following instruction given to the jury where the question of the insanity arose after conviction:

"If, therefore, a person sentenced for a crime is capable of understanding the nature and object of the proceedings going on against him, if he rightly comprehends his own condition in reference to such proceedings and can conduct his defense in a rational manner, he is, for the purpose of undergoing punishment, deemed to be sane, although on some other subjects his mind may be deranged or unsound. If the prisoner

has not at the present time, from the defects of his faculties, sufficient intelligence to understand the nature of these proceedings against him, and his impending fate and execution, the jury ought to find that he is not sane, and upon such finding he may be ordered to be kept in custody until his disability is removed."

In the case of State v. Helm, 69 Ark. 167, 61 S. W. 915, the Supreme Court of Arkansas was called upon to consider the degree of insanity which would exempt one from punishment after verdict and before judgment. In that state they had a statute on the subject which the court, however, held was simply declaratory of the common law. The court said:

"We therefore conclude and decide that, if a person convicted of a crime is by reason of a disease of the mind unable to understand the nature of the indictment upon which he was convicted, his plea thereto, and the verdict thereon, when explained to him by the court, and is unable to comprehend his own condition in reference to such proceeding, and by reason thereof might not make known to the court or the attorneys in charge of his defense the facts within his knowledge, if any, which would show that judgment should not be pronounced against him, he is, as to the pronouncing of such judgment, to be deemed insane, within the meaning of the statute."

In the case of Lee v. State, 118 Ga. 764, 45 S. E. 628, the question was raised, as in this case, after judgment. The court approved a charge given by the lower court to the effect that before the prisoner could be found insane it should be shown that he would not know he would deserve punishment for doing a wrong act, and would not comprehend the reason why he was being punished. In the case of Ex parte Schneider, 21 App. D. C. 433, the court held that on a petition for an order suspending the execution of a criminal alleged to be insane the court is required, before it can nullify the verdict of the jury and the judgment and sentence, to find that the prisoner is actually insane so as to be wholly unconscious of his situation. In the case of Freeman v. People, 4 Denio (N. Y.) 9, 47 Am. Dec. 216, the court considered a statute which declared:

"No insane person can be tried, sentenced to any punishment, or punished for any crime or offense, while he continues in that state."

The court stated that this statute was in strict conformity with the common-law rule on the subject. After considering many cases on the subject, the court said:

"With these lights before us, the construction of the statute which forbids the trial of any insane person, cannot be attended with much difficulty. A state of general insanity, the mental powers being wholly perverted or obliterated, would necessarily preclude a trial; for a being in that deplorable condition can make no defense whatever. Not so, however, where the disease is partial, and confined to some subject other than the imputed crime and the contemplated trial. A person in this condition may be fully competent to understand his situation in respect to the alleged offense, and to conduct his defense with discretion and reason."

In a recent case in California, State v. Lawson (Sup.) 174 Pac. 885, the court said:

"The evidence on the question of insanity was amply sufficient to support the conclusion that the defendant was sane within the meaning of the law applicable. That he was not perfectly poised mentally may be freely conceded. Such, however, is not the test. There was no substantial showing to the effect that his mind was in such condition that he did not rightly comprehend his own condition with reference to the proceeding against him, that he had been convicted of a crime punishable by death, and was before the court for the purposes of judgment on that conviction, or that he was then unable to present in a rational manner any defense that he might have, either on motion for new trial or to the pronouncing of judgment. Under the well-settled rule in this state it was incumbent on the defense to show this by a preponderance of evidence. The burden of proof was upon him."

No cases to the contrary of this rule have been cited by counsel for petitioner.

[6] Tested by this rule, we will proceed to examine the evidence and ascertain whether the petitioner is insane to such an extent that he should not undergo the punishment decreed.

Petitioner's sister, Mrs. N. Jacco, of Berkeley, Cal., testified that from 1898 to 1900 her brother, the petitioner, lived a neighbor to her in Butte, Mont., for six months; that on one occasion while living in Butte petitioner acted as though he were of unsound mind. She said they were having labor trouble in Butte, and the

militia had been called out; they were all sitting in the yard, when her brother became very excited, ran into the house, and got a shotgun; he said he knew the soldiers were going to kill his baby, a child three months old; her husband took the gun from him; that her brother later went to Alaska, returning from there in 1908 or 1909; that when he returned from Alaska he came to her home in Sacramento; that he was a complete wreck, the doctor stating that he was in the worst stages · of syphilis; that he had no control over the different parts of his body, and detailing other symptoms which would indicate presence of the disease stated; that he had been almost constantly in trouble of various kinds since he returned from Alaska; had served a term in the penitentiary at San Quentin; that he had an exaggerated idea of his own importance; that he would not talk to his sister about anything but water power; that he talked about a water wheel, saying that he was going to put in electric power all over the state; that he always talked up in the millions of dollars; that he made a great number of drawings of his scheme, and that he had never had any connection with machinery or irrigation in his life; that he had at one time advertised for some one to go into the butcher business with him, but that he had no money and had never been in the butcher business in his life. This, in substance, was the effect of the sister's testimony, elaborated, however, much more extensively than above set out.

The deposition of Dr. W. A. Cusick, of Salem, Or., was taken. The doctor testified that he had been practicing for a great number of years; that he was 80 years of age; that his practice had been general, but more particularly confined to the diseases of the nervous system; that he made an examination of A. B. Smith in the courthouse at Salem, Or., about 7 years ago; Smith had been arrested for larceny; that the result of his examination was that he came to the conclusion at that time that Smith was not responsible for his acts in connection with the crime with which he was charged; that he regarded him

as a mental derelict, otherwise a congenital paranoiac; that Smith's comprehension, owing to his mental condition, would be more or less indefinite, and he doubted if he could rightfully understand any proceedings against him; he also had doubts if he could present any matter in a rational manner; that Smith would be likely to misjudge a question of fact whether it was associated with his cause under consideration or otherwise; that Smith was not a monomaniac, but a paranoiac, irrational on all-subjects.

Joe Melugin likewise testified by deposition to the effect that he was the keeper of the cellhouse at the state penitentiary in which Smith was confined during the months of June, July, and August, 1918; that in his opinion Smith was suffering from a form of insanity; that he would take small pieces of tobacco and wrap them up and conceal them about his cell; that he would also take all the small pieces of strings and twines he could get and wrap them up and hide them about his cell. When the witness asked what he was doing it for, he stated that sometimes even a small string might make a million dollars for a person; that in discussing his former dealings he always talked in large numbers, seldom speaking in amounts of less than $100,000; that he spent a great deal of his time drawing what he called plans for some machinery for perpetual motion.

The superintendent of the state penitentiary, Thomas Hughes, and the assistant warden, Pat Dugan, both testified. Hughes stated that he saw Smith on an average of once a week during all the time that he had been confined there, which was for several months; that he talked with him frequently; and that Smith appeared perfectly rational at all these times. He had discussed with him fully the transaction of the killing of Sheriff Stephens by the escaped prisoners from the Deming jail, of which Smith was one, and that he gave him a very rational account of the affair. He told the superintendent, however, that he (Smith) did not have a gun and did not fire a shot, and that he could not understand, therefore,

why he should receive the same punishment as that meted out to Starr, who confessedly had fired the shot that killed Sheriff Stephens. He gave it as his judgment that Smith was a rational minded man.

Dugan testified that he saw Smith almost every day, talked with him frequently, and that Smith appeared to be a very intelligent man. Smith had likewise told him about the trouble, and gave a very lucid and connected account thereof. Both witnesses testified that after the affirmance of the judgment of the lower court, when Smith knew that his execution was but a matter of days, he became very nervous and excited, and seemed to fear death very much. Neither witness had talked to Smith on the subject of water wheels or water power.

The three doctors who examined Smith and testified at the hearing in the district court were produced, namely, Dr. Diaz, Dr. Knapp, and Dr. Umberhine. These physicians were all general practicioners, neither of whom had made a special study of mental diseases. They testified that Smith was a paranoiac; that they had made two examinations of him and had led him out upon the subject of water power and irrigation, and that he had described to them some wonderful invention which he claimed to have perfected which would revolutionize the water power system of the country, and that he was being persecuted by the Governor of the state of California and other men who desired to prevent him from perfecting his great invention; that Smith also had delusions of grandeur and imagined that he was being persecuted; that on other subjects he appeared to be rational and talked in an intelligent and rational manner.

Dr. Diaz stated that Smith had delusions and hallucinations on some subjects, while probably on others he was normal; that he seemed to be normal in everything except upon the subject of water power and hydraulics and the hallucinations of persecution; that upon most subjects he talked reasonably; that it was his opinion

that Smith understood and appreciated what was taking place in court at the time of the hearing; that Smith did not seem to realize and understand for what purpose he was being punished. He did not know whether Smith would have the knowledge of right and wrong on subjects disassociated from his hallucinations. In answer to questions by the court, Dr. Diaz stated that he appeared to be normal on all subjects except water and his hallucinations of persecution.

Dr. Umberhine testified that along certain lines disassociated from these delusions Smith seemed to be normal, but that along certain other lines he would not be; that the fact that he had delusions upon the subject of water power would not necessarily indicate that he was insane generally and had no knowledge of right and wrong; that Smith realized what was taking place at the time of the present hearing, but that he did not realize it like a normal man would; that Smith did realize and understand the extent of his punishment and what it was being done for; that the two examinations he made as to Smith's sanity were not enough to enable him to form an opinion as to Smith's responsibility in respect to the crime with which he was charged.

Dr. Knapp testified that he did not think Smith was able to take care of his own affairs, but that he did realize what he was charged with, and that he realized his present situation; that he knew what he was being punished for and that his execution would be a punishment; that he realized what it was for; that it was the penalty for the crime with which he was charged; that he thought Smith would be able to carry on ordinary business affairs and that in most cases he would consider him normal; that he thought Smith was normal on subjects aside from the delusions mentioned; that his delusions would not interfere with his ability to distinguish as between right and wrong in connection with the crime with which he was charged; that he might commit a crime of the character with which he was charged without realizing that he was doing a wrongful act.

Dr. Elder, who was present at the hearing in this court, and who later made an examination of Smith in connection with Dr. Massie, at the request of the Attorney General, testified that in his judgment a true paranoiac was not responsible in any direction; that he did not believe that he would appreciate the fact that his punishment was retribution, and not persecution; that from the extent of his examination of Smith he found nothing that would indicate that Smith did not fully appreciate and comprehend his present situation. He was not prepared to say that Smith was a paranoiac from the examination which he had made, but stated that, if a man has delusions and the other deficiences that a paranoiac has, he is not responsible in any direction, that is, a man cannot be insane in one direction and perfectly sane on any other question; that he made intelligent answers to all questions propounded to him by the witness and Dr. Massie.

Dr. J. A. Rolls testified that the fact that Smith had been a hard drinker and had suffered with syphilis did not indicate that he was a paranoiac; that the result of a brain disease caused by syphilis would be what is known as paresis, and not paraonia; that nothing had been stated at the time of the hearing at which the doctor testified that would lead him to believe that Smith was an insane man.

Dr. J. A. Massie testified that he was the prison physician and had made an examination of Smith; that he gave him clear answers to all questions that were asked of him; that he was extremely nervous and evidently very much afraid; that he thought that Smith comprehended and realized his position in regard to his impending execution; that he had sufficient intelligence to realize what he was being punished for; that in his opinion, based upon what he had read in the different medical works on the subject of paranoia, outside of his delusions he is able and competent of conducting business, and that his sense of right and wrong outside of that one delusion is practically normal; that a man abnormal on the

subject of water and who has committed a crime having nothing to do with the delusion would be capable of conducting his defense; that Smith appreciates his position to-day, that he is under sentence of death. And he named many medical works which hold that on all questions outside of the delusion they have a proper sense of right and wrong.

The above constitutes a synopsis of all the evidence submitted to the court. We have carefully considered the same, and are of the opinion that Smith is sane, and that he has sufficient intelligence to understand the nature of the proceedings against him and his impending fate and execution, and that he understands, knows, and is able to allege any fact which might exist tending to show that he should not be executed. Under the authorities hereinbefore referred to his execution should not be stayed, but the judgment which the law has pronounced should be carried out.

For the foregoing reasons, the court must decline to stay the execution.

HANNA, C. J., and PARKER, J., concur.