ESSEX COUNTY COURT OF OYER AND TERMINER.

STATE OF NEW JERSEY

*v.*

WILLIAM E. BATTLES.

**Criminal Insane—Act of 1922 Relating to Confinement in Asylum Pending Cure Considered—Power of Trial Court—Responsibility Assumed—Evidence Considered—Adjudication of Sanity.**

On indictment for murder. Opinion and conclusions as to sanity.

*Mr. William B. Brandon,* for the petitioner.

*Mr. John O. Bigelow,* prosecutor of the pleas of Essex county, and *Mr. Joseph L. Smith,* assistant prosecutor of the pleas of Essex county, for the state.

STICKEL, JR., J.

This is a proceeding initiated by the defendant, a person under sentence of death for murder, to determine whether he is so far insane as to be without sufficient degree of reason to be responsible for his crime, so as not to be conscious of having committed the crime he has been convicted of, so as not to be aware he is amenable to punishment, and so as to be unappreciative of his situation as one condemned to death, and, in case he is determined to be so insane, to transfer him to the New Jersey State Hospital at Trenton, there to be confined until he is sane, according to the standard provided by the act.

The proceeding is inspired by chapter 101 of the laws of 1922, page 186, but an examination of that act will indicate

that no authority is created by that act in this or any other court to make such inquiry.

It provides what shall be done with persons found insane according to the standards set up by the act, namely, that they shall be transferred to the New Jersey hospital at Trenton and what shall be done with them when so far sane under the act as to be the subject of execution, namely, that they be returned to state prison and the sentence of death carried out, but nowhere does it authorize the inquiry by the trial court. It implies that the court has the power, but does not confer such power.

Whence comes the power, then, that the act implies the trial court possesses?

Counsel for the defendant calls attention to section 172 of the Criminal Procedure act (*2 Comp. Stat. p. 1877*), but that section, clearly by its terms and according to the decisions of this state, does not apply to prisoners under sentence of death. *In re Herron, 77 N. J. Law 315; 72 Atl. Rep. 133; In re Lang, 77 N. J. Law 207; 71 Atl. Rep. 47.* No other statute has been called to my attention, nor have I been able to find any which confers the power to make the desired inquiry in the case of a prisoner sentenced to death.

It is true that section 437, class E of "An act concerning the charitable, correctional, reformatory and penal institutions, boards and commissions, located and conducted in this state, which are supported in whole or in part from county, municipal or state funds." Chapter 147, laws of 1918, page 343 (at *p. 390*), provides that where a person

"in confinement under commitment, indictment or sentence, or under any process, shall appear to be insane; epileptic, imbecile or feeble minded, the justice of the supreme court presiding in the courts of the county in which such person is confined, or judge of the court of common pleas of said county,"

may make inquiry into such a person's mental condition and transfer him to a proper institution for treatment, but a mere reading of this section in connection with chapter 101 of the laws of 1922 will serve to demonstrate that the section of the

1918 laws applies to all persons in confinement except those under sentence of death, while the act of 1922 establishes the· conditions under which persons sentenced to death may be transferred to the state hospital. ·

In this connection the observation of the court (*In re Lang, 77 N. J. Law 207; 71 Atl. Rep. 47*), in disposing of a somewhat similar situation, is very·much in point. The court said "we cannot agree that the legislature intended the same test of insanity to be made, the ground of deferring execution indefinitely in a case· like the present. It is of course entirely proper that a lawful citizen, or one accused of crime awaiting trial, or convicted of crime punishable by imprisonment, who is mentally deranged in any way, should be transferred to an asylum for treatment, and, if possible, cure, and also as a measure of protection to the public or his fellow-prisoners, as the case may be. He has his life to lead, and public policy requires that he should be treated so as to lead it to the best advantage on his release, if a prisoner, from his imprisonment. But the case of a murderer sentenced to·death is different. His life is forfeited, and we are not willing to adopt the view that in cases where the law has decreed that a murderer should be put to death, and the court or a jury has found that he is conscious of having committed a crime, is aware that he is amenable to punishment and is appreciative of his situation as a murderer condemned to death, he shall be permitted to escape just· punishment because of a mental infirmity which has no bearing on any of these features of the case.

"If this be the law, the capacity to distinguish between right and wrong with respect to an act of murder would become for all practical purposes an academic question in ·cases of murder committed under the influence of an irresistible impulse, as in *State* v. *Graves, 5 N. J. L. J. 54; Mackin* v. *State, 30 Vr. 495,* and *Genz* v. *State, 30 Vr. 488,* if it could be shown in an investigation under the statute that such impulse was due to mental derangement still persisting; or, indeed, if any other mental derangement, however insignificant or irrelevant, could be made to appear. We should

not be willing to say that the legislature intended to enact such a drastic change in our jurisprudence without some definite evidence of that intent, and such evidence we fail to find in the statute under consideration."

It will be observed that the legislature by the laws of 1922, chapter 101, has adopted a specific test of insanity as the ground for deferring execution, and that that test is couched in almost the exact language of the court in the *Lang Case*.

There being no direct statutory conference of the power to make the inquiry in question, we turn to the common law and there we find that the judge of the trial court was bound to grant a reprieve where after sentence the prisoner became insane. The reason given was "not that a man, who has become insane, is not a fit object of example, though this might be urged in his favor, but that he is incapable of saying anything in bar of execution or assigning any error in the judgment." *4 Bl. Com. 395; 1 Chit. Crim. L. 761; 1 Hale P. C. 34, 35; 1 Hawk. P. C. ch. 1 ¶ 4.* And see *Freeman* v. *People, 4 Den. (N. Y.) 9; 47 Am. Dec. 216,* and *Nobles* v. *Georgia, 168 U. S. Sup. Ct. 398.*

Whether this common law power of the trial court still exists may be questioned, particularly in view of the fact that the legislature after at one time providing for the procedure in case of insanity after sentence, including a sentence of death, repealed so much of the law as applied to sentences to death (see *In re Lang, supra*), but in view of the action of Mr. Justice Lippincott, in *In re Edward Clifford, 22 N. J. L. J. 176,* in proceeding to make such an inquiry under the rules of the common law, although noting the doubts as to the jurisdiction of the court, and in view of the clear legislative implication of the existence of the power shown by the act of 1922, I determined to make the inquiry, and to do so according to the common law rules, except so far as the act of 1922 may be said to modify such rules or procedure.

The present state of the law is not satisfactory, requiring as it seems to do a long inquiry into the sanity of one condemned to death, even where that issue has been heard and determined at a trial, wherever a physician or physicians

retained by the defendant conclude that the defendant is insane according to the standards set up by the act, and it would seem desirable that the legislature determine as a matter of policy either to confer or deny the power to make this inquiry, or, conferring the power, indicate the circumstances under which the court should initiate such an inquiry.

At common law the judge in his discretion might call a jury to his aid, but in view of the written request of the defendant and the earnest verbal appeal of his counsel, and because I believed the best interests of the state and defendant would be conserved by hearing this matter alone, I proceeded to assume the heavy burden myself.

This burden, this responsibility, is to determine whether the defendant is now, not at the time the crime was committed, so far insane as to be without sufficient degree of reason to be responsible for his crime, so as not to be conscious of having committed the crime of which he has been convicted, so as not to be aware that he is amenable to punishment and so as to be unappreciative of his situation as one condemned to death.

The court fully appreciates the grave character of this inquiry, and no words are needed to describe the responsibility which has been cast upon or assumed by it. It feels it, and keenly.

And because it feels that responsibility, I have given to counsel for the defence the widest latitude in the presentation of evidence, and, in the examining and cross-examining of witnesses, while the prosecutor moved, apparently, by similar considerations, has done nothing to hamper the defendant in bringing out to the fullest extent his claims and contentions, but, on the contrary, has co-operated in getting before the court such claims, while at all times denying their validity and accuracy, and offering in contradiction thereof the evidence secured by him, so that not only has the insanity of the defendant as of to-day been in fact tried, but his insanity as of the day of the murder as well.

I have listened carefully and attentively to the evidence; have made repeated inquiries to clear up doubtful points in

my mind, read all the exhibits, except the transcript of the trial, my memory of the trial being not only clear but vivid, and likely to remain so for some time to come, and I have taken time over night to deliberate and weigh the issue.

As a result, the very strong impression which the evidence made upon my mind at the conclusion of the hearing has become a fixed conclusion, namely, that William E. Battles not only is sane to-day but was sane at the time of the murder, and that he was then, and is now, of sufficient degree of reason to be responsible for his crime; was then conscious that he was committing a crime, and is now conscious of having committed it, that he is now aware that he is amenable to punishment, and was then so aware, and that he is now appreciative of his situation, as one condemned to death.

I will not go into an analysis of the evidence, but will content myself with a few observations and a brief reference to what appear to me to be salient points in the case.

If the matter were to be decided purely upon the experts' testimony—that is, purely upon the opinions of the experts for the state and the defence, the standing and qualifications of the experts for the state, their opportunity for observation of the defendant, and the basis for their opinion in the light of my own observation of the defendant at this hearing and at the trial, would alone suffice to satisfy me of defendant's sanity. Dr. Walter S. Washington, for instance, examined the defendant before the trial, saw and observed him all during the trial, examined him over four hours at Trenton and observed him throughout this hearing. Dr. Horsford, as an expert for the original counsel for the defendant, examined the defendant before the trial and observed him at this hearing, while Dr. Payne and Dr. Beling examined him at Trenton with Dr. Washington and observed him at the hearing. All found him sane; none found him suffering with dementia præcox, simple, or any form of dementia. Two of the experts produced by the defendant, Dr. Rosewater and Dr. Dowd, examined the defendant at Trenton over a period of five hours. Neither one had examined him before the trial or witnessed his demeanor at and throughout the

trial. Each expressed' the view that he was insane within the act and suffering from dementia præcox, simple. The third defence expert, Dr. Thompson, never examined the defendant at all, and, while expressing the opinion, based upon what he had heard and seen at the hearing, and upon the hypothetical question propounded to the doctors for the defendant that the defendant might, or, perhaps, was suffering from dementia præcox, simple, he, nevertheless, said that except when in the episodes or seizures of emotional insanity, which Dr. Dowd and Dr. Rosewater agreed characterized, or, at least, were present in cases of this kind, Battles would know the difference between right and wrong, would be conscious of having committed his crime, aware that he was amenable to punishment and appreciative of his present position.

But entirely aside from the fact that four experts for the state and one for the defence practically agree that the defendant is sane within the act and that but two, Drs. Rosewater and Dowd, find otherwise, and that these latter doctors by no means outrank any of the others in experience and qualifications, the nub of the question, it seems to me, lies in determining whether or not the important facts in the defence's hypothetical question are true, for, if they are not, even the opinions of the defence experts must of necessity be altered.

As I understand it, mental deterioration is always present in dementia præcox, simple, incoherency of speech is usually present, while delusions are sometimes present in simple and commonly in the advanced stages of dementia præcox, and indifference and suggestibility may be symptoms, probably are. Certainly if none of these elements were in fact present dementia præcox could scarcely be the diagnosis, as I understand the testimony.

Let us then take up the various elements. *Incoherency.* It is hard to understand how anyone could find the defendant incoherent in speech. Certainly, he was not at the trial, though his voice was low-pitched and he was, consequently, hard to understand, and the examination by the state's ex-

perts at Trenton reveal anything but incoherency in his answers at that time. *Mental deterioriation.* . The proof is that he finished the fourth grammar grade; that being so, his answers, except, perhaps, to the arithmetic questions and the "nonsense" questions, certainly do not show deterioriation, while his other answers, and particularly his definition of charity, justice and goodness, show not only thought but an excellent ability to express it. Moreover, his act in November, 1922, in deceiving the probation office as to his identity, in avoiding the natural effect of his prior record by giving not merely a false name, which probably would not have sufficed to hide his identity, but a false address, false names of relatives and false addresses for them, is something that no one in my memory has been clever enough to succeed in before. And this admitted evidence of mentality and sanity (see the testimony of Dr. Dowd) is the more significant because if the claim of the defence that Battles showed symptoms of dementia præcox in his early school life is true, it is practically agreed by all the experts that he must have advanced to the profound or hopeless stage of this disease long before the date of this occurrence. *Delusion.* The only delusion testified to was the story of the defendant that Wallace Brooks committed the deed. Dr. Dowd and Dr. Rosewater, who did not attend the trial, characterized it as a delusion. Dr. Washington, who did attend the trial and heard Brooks testify against the defendant, characterized it as a lie. Personally, having heard the story from the defendant almost immediately after the trial, having heard his denial at the trial that he, Battles, committed the crime, and having noted the persistence, with some variations, which he has detailed the story since Brooks testified against him, I am satisfied it is not a delusion. His very persistence in this story; his refusal at all times and up to date under rigid examinations to confess to all the details of the crime of which he has been convicted; the way he withstood the grilling cross-examination of Prosecutor D'Aloia at the trial, all to me negative any thought that he is suggestible, except when

it accords with his idea of what will help him, and that he is indifferent only when indifference suits his purpose.

It is clear to me that those facts which are the essentials of the hypothetical question, and the absence of which would require any expert to answer that the defendant was not insane, have not been proved to exist, and do not exist.

I have adverted to some of the things in the testimony which have caused me to arrive at my conclusion. There are many others, and, of course, I have not based my conclusion on the things I have adverted to alone, but upon a careful weighing, sifting, elimination and consideration of all the evidence.

As I pointed out before, the reason given at common law for deferring the execution of one insane was that he would be incapable of saying anything in bar of execution or of assigning error in the judgment.

There is not the slightest indication in this case that Battles is in that state of mind. On the contrary, his conduct and answers, his story about Brooks, his unwillingness to admit damaging answers heretofore given while admitting harmless ones, serves to indicate that if anything exists which. if alleged would avail him in bar of execution, he is quite capable of bringing it out.

I am satisfied, therefore, that he is now sane, and, being so satisfied, I deny the relief prayed for-by the petition.

I desire to thank counsel for their courtesy and assistance to me throughout this trying proceeding.

Mr. Brandon—I wish to express my thanks to the court for the wide latitude permitted in an effort to prove the facts set forth in the petition and the prosecutor's office.